[S.F. No. 24117. Nov. 10, 1980.]

GLENN D. RAMIREZ, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Glenn D. Ramirez, in pro. per., for Petitioner.

Herbert M. Rosenthal and Scott J. Drexel for Respondent.

OPINION

THE COURT.—Review of recommendation of the State Bar Disciplinary Board that petitioner, Glenn D. Ramirez, be suspended from the practice of law for a period of one year, that execution of the order for such suspension be stayed, and that petitioner be placed on probation for the period of one year on conditions including actual suspension for one month.

The disciplinary board found petitioner had violated his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, subds. (b), (d), and (f)) by "falsely maligning" justices of the Third District Court of Appeal. This finding is based in part on petitioner's statements, contained in a reply brief filed in the United States Court of Appeals for the Ninth Circuit, that the justices had—in reversing a trial court judgment in favor of petitioner's clients—acted "unlawfully" and "illegally" and had become "parties to the theft" of property belonging to petition-

er's clients. The board also based its finding on statements contained in a petition for writ of certiorari filed in the United States Supreme Court implying that the Court of Appeal justices had falsified the record and suggesting that their "unblemished" records were "undeserved."

Petitioner was admitted to the practice of law in Oregon in 1952 and in California in 1955, presently maintaining his law office, as a sole practitioner, in Klamath Falls, Oregon. He has no prior disciplinary record.

In May 1967, John V. and Aline S. Terry executed a loan agreement with Klamath Production Credit Association (KPCA), a farm credit bank, to obtain financing for their farming and cattle-raising operation in Tulelake, California. As security for the loan, the Terrys executed a lien on farm equipment and livestock and a deed of trust on all 239 acres of their farm. The Terrys received operating loans from KPCA totalling approximately $68,000.

KPCA refinanced Terrys' loans in 1968 and in 1969, and made additional loans in 1970. When the Terrys were unable to repay the loans at maturity in 1971, KPCA instituted an action in Siskiyou County Superior Court[1] seeking foreclosure of the security interests. KPCA alleged the Terrys were in default of principal and interest payments totalling approximately $45,000.

The Terrys retained petitioner to represent them in the foreclosure action. Petitioner cross-complained in behalf of Terrys, seeking compensatory and punitive damages and cancellation of the loan instruments on grounds of deceit and breach of fiduciary relationship.

Following trial, a jury awarded Terrys general damages of $60,000 and punitive damages of $5,000 grounding KPCA's liability on "deceit and undue influence," and the court entered judgment in those amounts. The judgment also relieved Terrys of any obligation to repay the outstanding balances of the KPCA loans.

On appeal the Third District Court of Appeal, in an unpublished opinion (Justices Puglia, Friedman and Regan) reversed judgment on grounds jury instructions were prejudicially erroneous and the judgment

---

[1]Klamath Production Credit Association v. John Terry et al. (Siskiyou Co. Super. Ct., No. 24951.)

was not supported by substantial evidence. On remand the trial court granted KPCA's motion for summary judgment.

Petitioner thereafter filed in United States District Court for Eastern District of California an action on Terrys' behalf against KPCA and Court of Appeal Justices Puglia, Friedman and Regan.[2] Petitioner alleged Terrys' property had been taken without due process of law in violation of the United States Constitution and the Civil Rights Act of 1863. The district court dismissed the action as to the justices on the ground of judicial immunity, and petitioner appealed on behalf of the Terrys to the Ninth Circuit Court of Appeals.[3]

In the course of the appeal petitioner filed in the Ninth Circuit a reply brief in which he stated Justices Puglia, Friedman and Regan had acted "unlawfully" and "illegally" in reversing the trial court's judgment in favor of the Terrys. He further stated: "The case involves the question: Are Appellate Judges above the law? As to KPCA: Can the judges give you what the law does not? (By taking the Terrys' property they become parties to the theft.)" Petitioner also implied the justices had improperly favored KPCA, stating: "Money is king, and some judges feel they are there to see that it doesn't lose."[4] Petitioner also stated that "the KPCA by its power and influence and money was able to induce the defendant judges to act in an unlawful manner...."[5] Fi-

---

[2]John V. Terry and Aline S. Terry v. Klamath Production Credit Association, Leonard M. Friedman, Robert K. Puglia and Edwin J. Regan (E.D.Cal. Civ. No. S-76-320).

[3]John V. Terry et al. v. Klamath Production Credit Association et al. (9th Cir. No. 77-1019).

[4]Petitioner states: "Terrys concede that error in State Court interpretation of law gives no cause of action in the Federal Court. It is the unlawful assumption of jurisdiction over matters not before them, and the entry of a remand order without the jurisdiction thus illegally assumed, which order deprives the Terrys of their property and legal rights without due process of law, that constitutes a cause of action under Federal law in the U.S. District Court. This question was avoided by the District Court by refusing to hear same. *This is the status of the poor litigant all too often in our Courts. Money is king, and some judges feel they are there to see that it doesn't lose.* This is contrary to the fundamental basis of our government." (Italics added.)

[5]Petitioner's full statement is as follows: "After seven years of additional hard labor (1967-1974), under KPCA Terrys were left with substantially nothing. They proceeded to a State Court trial where a jury awarded them $65,000 damages, including $5,000 punitive damages, and the trial judge removed KPCA's lien and encumbrances on their property. *Thereafter, the KPCA by its power and influences and money was able to induce the defendant-judges to act in an unlawful manner so as to deprive the Terrys of their compensatory damages, their property, including everything that they had worked for for over twenty-five years.*" (Italics added.)

nally, petitioner asserted in the brief that the justices maintained an "invidious alliance with KPCA" resulting in the deprivation of Terrys' judgment.[6]

While the appeal was pending in the Ninth Circuit, the State Bar commenced a disciplinary investigation. The hearing panel indicated during proceedings that it would consider terminating the investigation by admonition if petitioner would offer an apology to Justices Puglia, Friedman and Regan. The State Bar examiner stated she would oppose such a termination. (See former Rules Proc. of State Bar, rule 25.20, West's Ann. Bus. & Prof. Code, foll. § 6087.) Nevertheless, petitioner wrote a letter to the three justices, apologizing for and attempting to explain his statements. In the letter petitioner asserts he never intended his statements as an inference the justices had received money from KPCA to induce them to render a decision favorable to KPCA. Petitioner also moved in the Ninth Circuit Court of Appeals for permission to delete the offensive statements from his reply brief. Notwithstanding petitioner's action, the examiner caused the subsequent admonition to be set aside and formal proceedings to be resumed on the ground petitioner's statements concerning the justices warranted more substantial discipline.

After the Ninth Circuit affirmed the district court's judgment of dismissal of the Terrys' complaint, petitioner sought certiorari in the United States Supreme Court. Language in the petition for the writ permitted inferences that Justices Puglia, Friedman and Regan had falsified the record on appeal in the state court proceeding and additionally implied that the justices' "unblemished" judicial records were "undeserved."[7] As a result of petitioner's further statements, a second preliminary investigation hearing was conducted by the State Bar and the instant disciplinary proceeding was commenced.

---

[6]Petitioner's complete statement is as follows: "... The original action was filed in the Siskiyou County Superior Court of the State of California; this was tried before a judge and jury and an award was made in favor of the Terrys and against UPCA [*sic*]. *Thereafter, the defendant-judges with their invidious alliance with KPCA, did unlawfully act to deprive the Terrys of their judgment and impose a lien upon their property, taking away their legal rights of a trial by limiting, without authority, pleadings and evidence upon which they could proceed.*" (Italics added.)

[7]Petitioner stated: "Cases where there were no causes of action were dismissed on the basis of judicial immunity. This combined with the natural reluctance of one judge to pass judgment on another and strengthened the original error. Generally speaking, a judicial officer should be immune from actions for damages caused by error in his acting upon the matters before him. This can be corrected on appeal. *But where a judicial of-*

The hearing panel questioned petitioner extensively concerning the factual basis for his allegations against the justices. Petitioner asserted his belief that the justices had acted illegally in concluding there was no substantial evidence supporting findings of deceit and undue influence on the part of KPCA. He contended that by reversing the judgment the justices knowingly acted in excess of their judicial authority—hence "illegally."[8]

In support of his assertion that the justices were biased in favor of KPCA, petitioner notes that KPCA had obtained three extensions of time within which to file its opening brief on appeal. Moreover, at a settlement conference presided over by Justice Paras prior to oral argument, counsel for KPCA stated that banking institutions might wish to file amicus curiae briefs in the case. Petitioner apparently construed these circumstances as evidencing prejudice against his clients.

---

*ficer has acted outside of his jurisdiction and falsified the record to do so, and this deprives a citizen of his property and property rights, judicial immunity should not bar the remedy even though the officers be immune from personal liability.* Thus in an action brought for judicial wrong, the judge defends his reputation, the wrongfully benefited party loses his illicit gain, and the ends of justice are served. That the wrongful taking was under color of State law by the judges and Federal agency cannot be disputed. [¶] *Does the undeserved-unblemished reputation of a judicial officer outweigh the wrongful taking of a farm couple's property and livelihood under a misconceived theory of judicial self-preservation?* This is judicial sovereignty without legal basis or right." (Italics added.)

[8]At the hearing petitioner testified as follows: "Q. [Examiner] And thereafter it was determined by you, I guess, in consultation with your clients, to bring an action in the U.S. District Court naming the justices and KPCA as parties? [¶] A. [Petitioner] Yes. [¶] Q. Now in that cause of action, you alleged certain improper conduct on the part of the justices; isn't that correct? Illegal action? [¶] A. Well, conduct that would be actionable. 'Improper' could be a description, yes. [¶] Q. In that complaint, specifically, didn't you charge Justices Friedman, Puglia, and Regan with committing illegal acts as well as acting unlawfully? [¶] A. Yes. [¶] Q. What facts did you have in your possession at the time you made that complaint that caused you to make that allegation in the U.S. District Court action? [¶] A. The law of the State of California confers specific jurisdiction upon a Court of Appeals, and this specific jurisdiction denies them the right to find facts contrary to those of a jury or a trial judge who is trying the facts. [¶] In this particular case, the judges of the Court of Appeals went beyond the authority given them by law, and therefore this was termed 'illegally.' They went beyond the authority granted them by law in that they attempted to find facts that had already been concluded by finding of a jury and a trial judge. [¶] This is the explanation of the term 'illegally': unlawfully, in that they went beyond the authority granted them by law. [¶] They sent the matter down with findings of fact that they had entered and with directions as to what should be done with the case in the lower court contrary to the facts previously found by a trial jury and judge, and again beyond the law given them by the State of California."

Although petitioner testified he could produce no evidence of improper contacts between KPCA and the justices, he reasserted his belief that the justices had been induced to act in an unlawful manner by KPCA's "power, influence and money." Petitioner denied this statement was intended as an allegation that KPCA had paid money to the judges for the purpose of influencing their decision. The "power, influence and money" referred to, petitioner testified, were evidenced by the "battery of counsel they [KPCA] were able to send into even the most minute circumstances" and by KPCA's "alliance" with banking interests.

In response to questions regarding the factual basis for his allegation of the existence of an "invidious alliance" between KPCA and the justices, petitioner testified the nature of the federal court action necessitated the inclusion of that particular phrase. He relied on a federal court decision denying relief in a civil rights action for failure to allege existence of an "invidious alliance" or "invidious conduct," and for that reason he inserted the phrase "invidious alliance" into his brief.[9]

Petitioner also testified he felt the prevailing circumstances justified his characterization of the justices as "parties to the theft" of his clients' property. He asserted KPCA's actions constituted theft and the justices, in exceeding their authority and enabling KPCA to carry out that theft, became "parties to the theft." In an earlier deposition petitioner had stated his belief the argument could lawfully be made that the judges knowingly and intentionally committed an illegal act.[10] In effect, petitioner asserted that the justices "knew what they were doing" in allegedly acting beyond the jurisdiction of the court.

---

[9]Petitioner testified as follows: "CHIEF REFEREE TROXEL: To interrupt your flow for a moment, are you trying to tell us that basically all you were saying by this is that the judges were prejudiced against the Terrys and in favor of the Klamath Production Credit Association? [¶] MR. RAMIREZ: What I'm saying is that this was not a determination according to law, and that one of the explanations is invidiousness: in other words, the envy, the fact that this poor fellow shouldn't be allowed to rise in court and recover the judgment he had recovered. That's what I meant. [¶] CHIEF REFEREE TROXEL: This is your presentation? [¶] MR. RAMIREZ: Yes, sir. That's all the argument was intended to mean. [¶] REFEREE STEPHENS: You were using language from the Supreme Court of the United States—[¶] MR. RAMIREZ: The Court of Appeals. [¶] REFEREE STEPHENS: From the Court of Appeals to allege, by words of art, to cover an allegation which you felt the federal judiciary felt was essential to make a cause of action? [¶] MR. RAMIREZ: I felt the facts applied, and I felt the court said you have to state them, and I stated them."

[10]Petitioner stated in his deposition: "Q. [Examiner] So you are in effect accusing these justices of knowingly and intentionally doing an illegal act? [¶] A. [Petitioner] I don't find any explanation that they didn't know what they were doing in going beyond

With regard to his statement, "Money is king, and some judges feel they are there to see that it doesn't lose," petitioner contended the statement was not a specific reference to Justices Puglia, Friedman and Regan. Rather, the statement was intended as an assertion that "money receives extra consideration" in the courts. Petitioner further stated his purpose was to point out the inequity between the treatment of poor litigants and those with substantial financial resources.

Petitioner was further questioned about statements contained in his petition for certiorari to the United States Supreme Court regarding falsification of the record and the reputation of certain judges. (See fn. 8, *ante*.) The statements, petitioner testified, were not intended as accusations against specific justices. Petitioner asserted the language was used in the context of an argument against the doctrine of judicial immunity. According to petitioner, falsification referred to occurred when, on remand, it was made to appear that the trial court had found in KPCA's favor when the court had in fact entered judgment in favor of the Terrys. Any objective reading of the petition leaves little doubt that the statements, while intended to be couched as an argument against judicial immunity generally, refer specifically to the justices in question.

In his instant petition for review, petitioner contends: (1) the State Bar is without jurisdiction to proceed against him because such proceedings infringe petitioner's First Amendment right to freedom of speech; (2) the State Bar proceedings are an attempt to prevent Terrys from litigating their claims; (3) the board's findings are not supported by evidence; and (4) the State Bar is guilty of laches in that the hearing panel rendered its final decision in July 1979 but the record of the proceeding was not filed with this court until January 1980.

---

the proper dealings of an appellate court. There is no evidence whatsoever of that, and I don't believe that anybody is saying that the judges are not competent to understand the consequences, the effects of their act, or were competent to understand the statutes and the decisions of the State of California in relation to the authority and rights that they have as appellate judges. [¶] Q. So in effect you are saying that they knowingly and intentionally committed an illegal act? [¶] A. I am saying that that would be an argument that could lawfully be made under these circumstances. [¶] Q. But that in effect is what you are asserting in your cause of action? That's what you mean to assert? If it were merely error, as you say, it's something that is done innocently and unintentionally and not knowing that it's in error, but you are saying that it's illegal because they knowingly and willfully and intentionally did something that they knew was wrong, is that what you are saying? [¶] A. I am saying the inference could be argued from the decision of the matter which was presented, yes."

Petitioner's contention as to jurisdiction is without merit. It is settled this court has inherent power to regulate the practice of law and discipline members of the bar when such discipline is warranted. (*Stratmore* v. *State Bar* (1975) 14 Cal.3d 887, 889-890 [123 Cal.Rptr. 101, 538 P.2d 229, 92 A.L.R.3d 803].) Moreover, this court has jurisdiction to discipline member attorneys for defamatory or disrespectful statements contained in pleadings or other court papers. (*Hogan* v. *State Bar* (1951) 36 Cal.2d 807, 810 [228 P.2d 554]; *In re Philbrook* (1895) 105 Cal. 471, 477-478 [38 P. 511, 884].) In *Philbrook* this court specifically rejected the argument that "outrageous" and "unwarranted" statements concerning a justice of this court were protected by "free speech" considerations. The United States Supreme Court, in addressing First Amendment protections of false statements made with reckless disregard for the truth, stated that "[c]alculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that might be derived from them is clearly outweighed by the social interest in order and morality. . . .' *Chaplinsky* v. *New Hampshire*, 315 U.S. 568. . . . Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 75 [13 L.Ed.2d 125, 133, 85 S.Ct. 209].) As has been demonstrated, petitioner's several demeaning statements have been made with reckless disregard of the truth.

Petitioner makes no showing in support of his second contention that the initiation of disciplinary proceedings has prevented him from representing his clients, or that the Terrys have otherwise been prevented from litigating their claims.

Petitioner's third contention based on the claimed insufficiency of the evidence clearly fails. Petitioner bears the burden of showing the board's findings are not supported by the evidence or that recommended discipline is unwarranted. (Bus. & Prof. Code, § 6083, subd. (c); *Wells* v. *State Bar* (1978) 20 Cal.3d 708, 713 [144 Cal.Rptr. 133, 575 P.2d 285].) The findings are supported by any objective reading of the statements in question, and petitioner's explanations fall far short of sustaining his burden.

The record indicates the allegations contained in petitioner's reply brief filed in the Ninth Circuit and in his petition for writ of certiorari filed in the United States Supreme Court are not supported by any

credible factual basis. His statements regarding the purported alliance between KPCA and the justices, for example, were based solely on conjecture without factual substantiation. Additionally, he appears to have made no investigation to determine whether such facts existed.[11] Although petitioner contends in part that his statements were not intended as allegations against the specific justices, a reading of the statements in context reveals the allegations clearly refer to them. Petitioner's testimony as to his intentions is insufficient to rebut the evidence presented at the hearing and the plain meaning of the language used.

Petitioner's fourth contention that these proceedings are barred by laches is without merit. ■ Mere lapse of time is neither a denial of due process nor a jurisdictional defect in an attorney disciplinary proceeding absent a showing of specific prejudice. (*Wells* v. *State Bar, supra*, 20 Cal.3d 708, 715; *Caldwell* v. *State Bar* (1975) 13 Cal.3d 488, 496 [119 Cal.Rptr. 217, 531 P.2d 785].) Petitioner fails to make any such showing.

It appears clear petitioner has violated his oath and duties as an attorney and is subject to discipline therefor.[12] In support of the recommended discipline, this court has heretofore disciplined attorneys for violating their oath and duties in making unjustified and demeaning allegations against judicial officers. In *Hogan* v. *State Bar, supra*, 36 Cal.2d 807, an attorney was suspended for asserting a judge was a "petty judge" who was prejudiced against the attorney's client and certain witnesses.

---

[11]Petitioner testified as follows: "Q. [Examiner] You don't believe that their decision [reversing the trial court judgment] was an innocent mistake? [¶] A. No, I don't. I believe it was influenced in a manner that is not proper. [¶] REFEREE STEPHENS: How and in what fashion was it influenced? [¶] MR. RAMIREZ: I feel it was influenced by slight innuendos, derogatory conversations about the case, about the people involved, about things that—you know, when the judges have such a mass of work that for them to go in—and if you don't put an error down in the brief, if you don't but [*sic*] an error down in your argument, they're not going to find it. [¶] REFEREE PATINO: Mr. Ramirez, you don't have any evidence—those are your feelings. Do you have any evidence to prove that then or now the judges were approached, were contacted, or in any way influenced by any actions by KPCA? [¶] MR. RAMIREZ: No. I made no investigation."

[12]An attorney's oath requires that he "discharge the duties of an attorney...to the best of his knowledge and ability." (Bus. & Prof. Code, § 6067.) Among such duties, an attorney is required to "maintain the respect due to the courts of justice and judicial officers," to "employ...such means only as are consistent with truth," and to "abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he is charged." (Bus. & Prof. Code, § 6068, subds. (b), (d) and (f).)

In *Peters* v. *State Bar* (1933) 219 Cal. 218 [26 P.2d 19], an attorney filed affidavits containing allegations a judge was under a "political obligation" to an opposing attorney. This court determined the statements had no basis in fact and were made with at least conscious disregard of their truth or falsity, and ordered the attorney be suspended.

In *In re Philbrook, supra*, 105 Cal. 471, an attorney filed a brief on appeal in this court containing "offensive, scandalous, and contemptuous language" concerning one of this court's justices and two superior court judges. The brief also contained language inferring the justices may be improperly influenced in deciding the appeal. Such conduct was deemed to exhibit "only a sheer intent to be maliciously contemptuous" and to warrant suspension of the attorney for three years to insure public confidence in an impartial judiciary.

Petitioner does not address the issue of recommended discipline. The record indicates he may well have been motivated by a good faith belief in his clients' position and the need for vigorous action in protecting their claimed rights. Petitioner has consistently maintained his statements were made in the course of what he believed to be zealous but proper representation of his clients" interests.[13] He describes himself as a "poor persons' lawyer," a characterization illustrated by his representation of the Terrys—who appear to have limited assets—for nearly nine years. He states the problem giving rise to the disciplinary proceedings is one of semantics, contending the State Bar has misconstrued the language contained in his court filings.

A factor which might be considered in assessing discipline is petitioner's apology to the justices he had vilified. (Compare *Peters* v. *State Bar, supra*, 219 Cal. 218, 223; *In re Philbrook, supra*, 105 Cal. 471, 481.) However, after having been put on notice of the seriousness of his misconduct and apparently persuaded that an apology was in order, petitioner again maligned the justices with suggestions comparable to his earlier aspersions in seeking relief from the United States Supreme Court.

---

[13]Petitioner testified as follows: "REFEREE PATINO: Were you aware of the fact, though, that as a California lawyer if you felt that a judge had done wrong, you could file a complaint with the Commission on Judicial Qualifications? [¶] MR. RAMIREZ: I wasn't concerned—I feel that the people in Sacramento work with these people. They know them better than I do. I was concerned with the fact that an illegal act had taken—was threatening to take the entire life's work of Mr. and Mrs. Terry, that there was no other reason other than the law that was doing that to them, and that was my only concern. My only concern was their case."

Petitioner's zealous representation of the Terrys cannot excuse the breach of his duties as an attorney. Appropriate discipline must be imposed, if for no other reason than the protection of the public and preservation of respect for the courts and the legal profession. (See *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].)

It is ordered that petitioner be suspended from the practice of law in this state for a period of one year commencing on the effective date of this order; that execution of the order of suspension be stayed and petitioner be placed on probation for such one-year period upon conditions (1) he be actually suspended from the practice of law in this state for the first 30 days of the probationary period, (2) he take and pass the Professional Responsibility Examination administered by the Committee of Bar Examiners within one year after the date upon which this order becomes effective (see *Segretti* v. *State Bar* (1976) 15 Cal.3d 878 [126 Cal.Rptr. 793, 544 P.2d 929]), and (3) he comply with the State Bar Act and Rules of Professional Conduct of the State Bar during the probationary period. This order shall become effective 30 days after the opinion herein is filed.

**NEWMAN, J., Dissenting.**—The State Bar asks us to rule that certain action recommended by its disciplinary board is "fully justified and amply warranted." (Brief filed on Apr. 14, 1980, p. 38.) The discipline recommended is (1) actual suspension from the practice of law for 30 days, (2) probation for 1 year, and (3) a requirement that the disciplined attorney pass the Professional Responsibility Examination. He has been practicing law for nearly 30 years, is a sole practitioner, and has no record of prior discipline.

What were his misdeeds? The bar contends that he represented two clients too zealously and that, contrary to law, when he sought to preserve their cause of action for alleged judicial usurpation of authority, he claimed that the usurpations reflected the influence of wealth in the administration of justice. He wrote carelessly; and his attack on a system that assertedly breeds judicial usurpation might, by some, be read as an attack on the integrity of three appellate judges. Yet absent any evidence, other than his words, that he sought to charge the judges with some kind of corruption, should not those words be read as no more than a forceful contention that the appellate judges had usurped the power of the jury and of the trial judge by setting aside the verdict and judgment? (Cf. the comparably forceful dis. opn. in *Barrett* v. *City of*

*Claremont* (1953) 41 Cal.2d 70, 80 [256 P.2d 977]: "This is not announcing a rule of law—it is a rule of four men—who may be for the time being, men who have a preconceived notion in cases such as this, and who are disposed to usurp the function of the jury and trial judge in a grasp for power—power denied them by the Constitution and laws of this state.")

The disciplinary board's eighth finding states: "There is sufficient evidence to support a finding that the Respondent has falsely maligned three Justices of the District Court of Appeals [*sic*], and that the Respondent has gone far beyond the borders of fair judicial criticism, in fact, has accused the Justices of a crime, to-wit, theft. The statements are not 'fair comment,' they are 'abusive and defamatory.' Respondent has violated the provisions of sections 6067 and 6068 (b), (d) and (f) of the Business and Professions Code of the State of California."

The relevant sentence of that first cited section, section 6067, provides: "Every person on his admission shall take an oath to support the Constitution of the United States and the Constitution of the State of California, and faithfully to discharge the duties of any attorney at law to the best of his knowledge and ability." Clearly that is not much of a guide in this case.

Subdivisions (b), (d) and (f) of section 6068 read: "It is the duty of an attorney:....(b) To maintain the respect due to the courts of justice and judicial officers....(d) To employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law....(f) To abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he is charged."

What comprises the "sufficient evidence" the board construed as justifying its conclusion that "Respondent has violated...6068 (b), (d) and (f)"? The pertinent findings are:

"III

"In the complaint which Respondent caused to be filed in the Federal Court Action, Respondent alleged that Justices Friedman, Puglia and Regan 'unlawfully' and 'under the color of their office as Justices of the

Court of Appeals' reversed a decision of the Superior Court of Siskiyou County entered in favor of Respondent's clients.

"IV

"Respondent's complaint was dismissed by the United States District Court and Respondent appealed to the United States Court of Appeals, and in his brief filed with that court alleged:

"(a) 'The Defendants, FRIEDMAN, PUGLIA and REGAN invidiously reversed a judgment of the trial court in favor of the TERRYS' [*sic*] on the basis of erroneous jury instructions and verdict form."

"(b) 'The error charged to KPCA and the defendant judges constitutes an illegal violation of due process, not error in interpretation of the law.'

"(c) 'Money is king, and some judges feel they are there to see that it doesn't lose.'

"(d) 'Thereafter, the KPCA by its power and influences and money was able to induce the defendant-judges to act in an unlawful manner so as to deprive the Terrys of their compensatory damages, their property, including everything that they had worked for for over twenty-five years.'

"(e) 'Thereafter, the defendant-judges with their invidious alliance with KPCA, did unlawfully act to deprive the Terrys of their judgment and impose a lien upon their property, taking away their legal rights of a trial by limiting, without authority, pleadings and evidence upon which they could proceed.'

"(f) 'The case involves the question: Are Appellate Judges above the law? As to KPCA: Can the judges give you what the law does not? (By taking the Terrys' property they become parties to the theft.)'

"V

"Thereafter in a petition to the United States Supreme Court for a Writ of Certiorari, Respondent alleged:

"(g)   'But when a judicial officer has acted outside of his jurisdiction and falsified the record to do so, and this deprives a citizen of his property and property rights, judicial immunity should not bar the remedy even though the officers be immune from personal liability.'

"(h)   'Does the undeserved-unblemished reputation of a judicial officer outweigh the wrongful taking of a farm couple's property and livelihood under a misconceived theory of judicial self-preservation? This is judicial sovereignty without legal basis or right.'

"(i)   'This case does not charge the Respondents Friedman, Puglia and Regan with error, but with judicial wrong doing.'

"VII [VI?]

"Respondent, in testifying before the Hearing Panel expressed a continuation of his belief that the Appellate Justices had acted in violation of the law and that it was not 'an innocent mistake on their part, as evidenced by their innuendoes and derogatory remarks.' It is obvious to the Hearing Panel that the Respondent became so personally engrossed in his clients' case that he lost all perspective and objectivity. After his letter of apology to the justices, he still persists in his opinion that the justices are part of a conspiracy to defraud his clients."

*In fact what happened?*

Those findings hardly tell the full tale. We must study the record to learn, for instance, about the lawsuits involved. In petitioner's words, on behalf of John and Aline Terry he filed a complaint in federal court on June 11, 1976, "for injunctive relief and damages...to redress the deprivation of...rights and privileges and immunities secured by the Constitution and laws of the United States." The defendants were Klamath Production Credit Association (KPCA) and the three California Court of Appeal justices.

Further (quoting from his complaint to the federal trial court): "[Plaintiffs] in 1967...were contacted by the Defendant KPCA regarding a farm operating loan to refinance their farm operation. [¶] Thereafter, KPCA by deceit and undue influence induced Plaintiffs to pledge their entire farm operation to secure payment of purported operating loans and through the control derived by said operating loans did injure and damage Plaintiffs in excess of $120,000.00 . . . .[¶] [KPCA]

did commence a suit in the Superior Court of Siskiyou County California for foreclosure against Plaintiffs and attempted to take Plaintiffs entire properties and in said suit Plaintiffs did counter-sue for their damages as aforesaid. . . . [¶] A jury was empaneled to try contentions of the Parties, was instructed by the Trial Court upon instructions agreed to by respective counsel for Plaintiffs and Defendant KPCA and given the jury form agreed upon between the Parties, after deliberation returned a verdict finding KPCA guilty of deceit and undue influence and awarding Plaintiffs damages in the sum of $60,000.00 general damages and $5,000.00 punitive damages against [KPCA, (¶) which then] appealed to the Court of Appeals, Third Appellate District. . . upon the grounds that punitive damages were not allowable against a Federal Agency, and that evidence relating to punitive damages tainted the verdict. The transcript on appeal omitted the discussions and agreements between counsel and the Court (although same were reported) relating to instructions and the verdict; no argument was presented to the Court of Appeals relating to instructions or verdict by either counsel and the question of instructions and verdict was not otherwise presented to the Court of Appeals. . . . [¶]. . .Defendants FRIEDMAN, PUGLIA and REGAN under the color of their office as Justices of the Court of Appeals. . .did reverse Plaintiffs aforesaid judgment contrary to California law and precedent prohibiting retrial of facts tried by a jury, restricting appeals to those matters lawfully before the Court, and limiting the reversals to unjust results. . . . [¶] The aforesaid acts of the aforesaid Justices unlawfully acting under the color of their office has deprived the Plaintiffs of their property and the use thereof without due process of law; and unless they are restrained from enforcing said Order, Plaintiffs will be permanently and irreparably damaged in the loss of their ranch and properties in the award for damages previously obtained together with their costs of suit including reasonable attorney fees. . . . [¶] [KPCA] in prosecuting said appeal totally lacking in merit, and in taking advantage of the illegal acts of the Defendants, FRIEDMAN, PUGLIA and REGAN, did and will cause Plaintiffs loss of income in excess of $20,000.00 per year commencing with 1974 through the time of trial herein."

### The allegedly offensive words

With regard to its findings IV and V, above, the board ingeniously sifted the federal court reply brief and certiorari petition that were filed in March and December 1977, respectively. Words such as "invidious" and "invidiously," "induce," "parties to the theft," "falsified," and "un-

deserved-unblemished reputation" were lifted out to bolster the conclusions (in findings VII and VIII) that petitioner evidenced "his opinion that the Justices are part of a conspiracy to defraud his clients," "falsely maligned three Justices," and "accused [them] of a crime, to wit, theft."[1]

I think that the critical paragraphs of petitioner's reply brief, his letter of apology, and his certiorari petition—when fairly and empathetically read and when augmented by his statements (1) that he is a "poor person's lawyer," and (2) that the aim of his advocacy was "to point out the inequity between the treatment of poor litigants and those with substantial financial resources"[2]—suggest that the words the board has tabbed do not warrant the proposed discipline. In context, especially when we keep in mind that the three justices were defendants in the case he brought and apparently were relieved from liability by the federal court not after a fair trial but only because of "judicial immunity," all that the words disclose is that petitioner was a relatively inexperienced lawyer on appeal who, with ambiguity perhaps, spoke sincerely though inelegantly on behalf of his clients, "[as] required by the justice of the cause with which he is charged." (Bus. & Prof. Code, § 6068, subd. (f), *supra*; see too Prosser, Handbook of the Law of Torts (4th ed. 1971) p. 748: "One obvious rule...is that an entire writing...must be construed as a whole. The plaintiff may not lift words out of their context, and the defamation contained in one line may be negatived or explained away by what appears elsewhere.")

---

[1] Cf. the separate opinion in *In re L. A. County Pioneer Society* (1953) 40 Cal.2d 852, 874-875 [257 P.2d 1]: "I dissent from the order denying appellant's petition for rehearing, and in view of the contention of appellant...that the effect of the decision of this court is to deprive it of its property without due process of law, I am constrained to comment....[¶] The record in this case presents *one of the most outrageous examples of legalized larceny which has come under my observation*....[¶] With respect to corporations, this court is empowered only to apply the statutory law of the state as it was written by the Legislature; it is not empowered to ignore the statutory provisions relating to corporations and effect a distribution of corporate assets *as its collective whim may dictate*." (Italics added.)

See also Black, *Attorney Discipline for "Offensive Personality" in California* (1980) 31 Hastings L.J. 1097, 1133 ("the judiciary itself is not altogether innocent of offensive personality").

[2] "[I]f the process focused on defendants who came from a class of persons with political power, the power of those people could itself provide a check on the court and ensure the acquittal of the innocent. An example of this occurred during the 1960s when middle class white defendants flooded into the criminal process as the public demanded the arrest of illegal demonstrators and marijuana users. Once in the process, however, even the most minor violation arising out of a demonstration generally result-

*Liberty of speech*

In appellate litigation some Queensberry rules as to lawyers' speech are essential, whether or not some clients think the rules are too gentlemanly. Yet the State Bar officials and the judges who interpret Business and Professions Code sections 6068, subdivisions (b), (d) and (f), *supra*, should remember that section 2 of article I of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."[3]

When does a lawyer "abuse . . . this right?" And when may the rights of lawyers (and thus their clients[4]) be restrained or abridged? Only, I submit, in very restricted situations. For instance, could the State Bar duly entertain charges that a prosecutor violated his ethical duties when, outraged that this court reversed a death sentence he successfully had sought at trial, he is reported to have pronounced: "It's obvious with this decision that they (the majority members of the Supreme Court) will use any silly reason they can find to avoid letting a death sentence stand. . . . [T]he four justices have violated their oaths to uphold the Constitution and they should be recalled."? (See Welborn, *Prosecutor Plans Recall Drive Over Ruling on Death Penalty*, Santa Ana Register (June 11, 1980) pp. A 1, A 10; cf. *United States* v. *Morgan* (1941) 313 U.S. 409, 421 [85 L.Ed. 1429, 1435, 61 S.Ct. 999],

---

ed in a jury trial. Further, I witnessed dozens of different instances when prosecutors dismissed cases at trial because they doubted the defendant's guilt. The power of the middle class thus protected its sons and daughters. But this power did not necessarily spring from any ability of the individual defendants or their families to bring the judge's actions under public scrutiny or to affect the judge's chances at the next election. Rather, this power seems to have had its source both in the personal identification which the judges and prosecutors felt with these middle class defendants and their families, and in the middle class expectations of all parties as to how our criminal justice system operates, expectations that no one involved was prepared to disappoint." (Mitchell, *The Ethics of the Criminal Defense Attorney—New Answers to Old Questions* (1980) 32 Stan.L.Rev. 293, 318; cf. Clifford, *President's Message* (1980) 55 State Bar J. 230: "President Jimmy Carter has charged that 10 percent of the people receive 90 percent of the legal services available in this country.")

[3]In *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 81 [64 L.Ed.2d 741, 752, 100 S.Ct. 2035], the United States Supreme Court observed that the people of California in that section have conferred "individual liberties more expansive than those conferred by the Federal Constitution."

[4]This opinion addresses solely the attorney's rights. Unjustified restrictions on his speech may, of course, in many situations deprive the client of due process rights.

regarding "a practice familiar in the long history of Anglo-American litigation, whereby unsuccessful litigants and lawyers give vent to their disappointment in tavern or press.")

The dispute here does not concern (1) a lawyer's out-of-court comments, or (2) his in-court oral comments. It relates exclusively to comments he has made in a reply brief and a certiorari petition. No one suggests that petitioner violated criminal law or defamation law. Might the allegedly offensive words, however, constitute contempt of court? Apparently not, because 90 years ago the Legislature pronounced that "[n]o speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of such court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings." (Code Civ. Proc., § 1209; cf. Edgemon, *Verbal Misconduct in the Courtroom—Are Attorneys Immune?* (1970) 11 Santa Clara Law. 125; Farber, *Civilizing Public Discourse: An Essay on Professor Bickel, Justice Harlan, and the Enduring Significance of Cohen v. California* (1980) Duke L.J. 283, 303.)

Nearly 70 years ago, troubled by a letter that "falsely imputes to the justices of this court improper conduct of which they are entirely innocent," Justices Shaw, Sloss, Lorigan, Henshaw, and Melvin ruled that lawyers are not immunized by Code of Civil Procedure section 1209, *supra.* (*Matter of Shay* (1911) 160 Cal. 399, 407 [117 P. 442].) Yet even if we were to ignore the free speech developments that began in the following decade (the 1920's), the *Shay* interpretation of that code section (160 Cal. at pp. 406-407) should not, I believe, survive the perceptive response of Justice Angellotti and Chief Justice Beatty, the dissenters in *Shay.* (*Id.*, pp. 408-410; cf. Edmonds, J., dis. in *Hume v. Superior Court* (1941) 17 Cal.2d 506, 516 [110 P.2d 669]; *Bridges v. California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346] [reversing *Bridges v. Superior Court* (1939) 14 Cal.2d 464, 479-484 (94 P.2d 983), and *The Times-Mirror Co. v. Superior Court* (1940) 15 Cal.2d 99, 102-103 (98 P.2d 1029)], which in fn. 3 (314 U.S. at pp. 260-261 [86 L.Ed. at p. 202]) states: "[T]he only evidence we have of the California legislature's appraisal indicates approval of a policy directly contrary to that here followed by the California courts....")

Also meriting emphasis is the dissenting opinion of Mosk, J. (Tobriner, J. conc.) in *In re Buckley* (1973) 10 Cal.3d 237, 259 [110

Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248], which quotes both *Craig* v. *Harney* (1947) 331 U.S. 367, 376 [91 L.Ed. 1546, 1552, 67 S.Ct. 1249] ("[T]he law of contempt is not made for the protection of judges who may be sensitive. . . . Judges are supposed to be men of fortitude, able to thrive in a hardy climate.") and Professor Max Radin's *Freedom of Speech and Contempt of Court* (1942) 36 Ill.L.Rev. 599, 611 ("It is. . .not a legal duty to be well mannered and it may even be said that it would be unconstitutional to make it one.[¶]. . .[T]here is no reason why the dignity of the court should take such dimensions or assume such a character that it demands awe or veneration."). Justice Mosk stressed *Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 795-796 [192 P.2d 905], where Justice Traynor stated: "Attorneys must be given a substantial freedom of expression in representing their clients. 'An advocate is at liberty, when addressing the Court in regular course, to combat and contest strongly any adverse views of the Judge or Judges. . . .' (Oswald, Contempt of Court (3d ed.), pp. 56-57. [Citation])."

The State Bar and the majority here rely primarily on three precedents—one (*Hogan*) decided in 1951; the second (*Philbrook*) decided in 1895; the third (*Peters*) decided in 1933.

I am not persuaded that *Philbrook* outlives the free speech developments that began in the 1920's. (Cf. Patterson, *The Limits of the Lawyer's Discretion and the Law of Legal Ethics: National Student Marketing Revisited* (1979) Duke L.J. 1251, 1273 ("[T]he pace of change in the law of legal ethics has, until recent years, been glacial."); see also Powell, *The Organized Bar Under Scrutiny*, Am. Bar Foundation Research Rep. (Spring 1980) No. 16, p. 1.) In addition, petitioner's conduct in our case exemplifies neither "a sheer intent to be maliciously contemptuous" (*Philbrook, supra*, 105 Cal. at p. 478) nor the type of personalized attack that led to the discipline in *Peters* (219 Cal. at pp. 220-224).

As to *Hogan*, it was charged there that the lawyer "engaged in offensive personality by referring in a disparaging way to the judge presiding in the case, charging him with being a petty judge, with acting as a prosecutor and attorney for the plaintiff in the case, and with being prejudiced against certain witnesses because of their religion." (36 Cal.2d at p. 808.) Therefore on the facts it too seems distinguishable. Moreover, there is ample reason for doubting that in 1980 we should mark

*Hogan* as a sufficient response to free speech arguments when neither the First Amendment nor article I, section 2, of the California Constitution was even mentioned. (Cf. Black, *Attorney Discipline for "Offensive Personality" in California, supra*, 31 Hastings L.J. 1097, 1106-1107, and also p. 1099: "By far the largest part of the rules regulating attorneys controls the content of communication or expression, rather than restricting non-expressive conduct. Thus, these restraints qualify for the strict scrutiny reserved for enactments abridging pure speech. [Fn. omitted.] Few of these enactments were devised to accommodate first amendment values and many probably are vulnerable to invalidation for vagueness or overbreadth. Unfortunately, instead of responding to these developments, to date the State Bar has defended the status quo tenaciously.") I observe, though, that in *Hogan* the court's handling of the libel law arguments (36 Cal.2d at pp. 810-811) is illustrative of reasons why the State Bar's and majority's reliance here on *Garrison*, 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209], is inapt. (Cf. the dis. opn. of Brennan, J. in *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448, 472 [47 L.Ed.2d 154, 173, 96 S.Ct. 958].)

### *Who will be protected?*

Citing *Bradpiece*, 10 Cal.3d at page 748, the majority in our case conclude: "Petitioner's zealous representation of the Terrys cannot excuse the breach of his duties as an attorney. Appropriate discipline must be imposed, if for no other reason than the protection of the public and preservation of respect for the courts and the legal profession." (Majority opn., *ante*, p. 414.)

Will the discipline now imposed help protect the public and preserve respect for courts and the profession? When writing his briefs must every lawyer—even in a case where he is suing judges for their alleged malfeasance—neither insinuate nor recite that there are institutionalized distortions? Must he remain mute, regardless of his own and his clients' views, as to charges that the court system as a whole inherently profits the Establishment?

Almost daily, newspaper headlines confound the proposed insulation of judges from their environs. "A mistrial declared in the case of two white ranchers accused of torturing three Mexicans could touch off violence among Hispanics...," we learn on page 3 of the Los Angeles Daily Journal of July 31, 1980. Across the entire page A 21 of the San Francisco Sunday Examiner and Chronicle of June 29, 1980, we read:

"'Justice is not guaranteed in Miami,' says Miami Times publisher. 'If you get justice it's an accident.'" (Cf. *Fire and Fury in Miami* (June 2, 1980) Time, at p. 10: "Strongest of the riot's many causes was a sense of injustice." See also, illustratively, the interview regarding current activities of the Mexican American Legal Defense and Education Fund employment litigation unit in 9 MALDEF No. 3 (1979) pp. 1, 5.)

At the recent Media Workshop on California Courts sponsored by the California Judges Association, the California Newspaper Publishers Association, the Radio and Television News Directors Association, and the Radio and Television News Association of Southern California, B. E. Witkin, esteemed keeper of our conscience, inter alia delivered these remarks (see the Los Angeles Daily Journal (July 3, 1980) p. 4): "For decades many of our finest minds—in the law schools, in the bar and on the bench—have been relentlessly exposing the ailments of the system. . . . In various ways [their] studies and reports deliver the same message: that while lawyers never had it so good, the legal system never had it so bad. [¶] One of these reports. . .comes from the nation's most articulate contemporary in-house observer, John Frank of Phoenix, Arizona. . . . [¶] Toward the end of [his] comprehensive review of our legal institutions and the manner of their operation, he offers a considered judgment: 'First,. . .American civil justice has broken down; the legal system fails to perform the tasks that may be expected of it. Second, the collapse is now. It menaces the rights of our citizens to a determination of their disputes and jeopardizes the capacity of commerce and industry for reasonable planning and action. Third, the curve is down; the situation is getting worse. Fourth, we have no generally accepted remedy. We do not even have a generally accepted program for discussion.' [¶] Frank describes. . .in fearsome detail our expensive advocacy and counselling, our cumbersome procedures, our crowded civil trial courts, our slow moving appellate courts, our criminal trial sideshows and our long drawn out postconviction reviews of criminal convictions. And, as he dissects the majestic failures of reform movements of the past, he warns us that our current legislative and judicial efforts are often based upon the same misconceptions that fatally infected the others. . . . He concludes with a series of far-ranging recommendations, prefaced by this declaration: [¶] 'We must be prepared to reconstruct the institutions of the law and remodel our lawyers and our judges, even our buildings. We must be prepared to change the substantive law altogether, in every reach, cutting it down to a size our groaning court system can handle. We must be prepared most radically to change our methods.'"

In a current issue of the Stanford Law Review one reads: "Our courts are not just, and they are most frequently unjust when dealing with the most powerless defendants, the poor and the minorities." (Mitchell, *supra*, 32 Stan.L.Rev. 293, 321-322; see also the book reviews of Hazard, Ethics in the Practice of Law (1978) by R. Kasanof ("The poor believe that the administration of justice is hopelessly weighted against them...") and L. Nader ("The law is being used to benefit the powerful."), 89 Yale L.J. 1438, 1442, 1449 (1980); cf. tenBroeck & Tigar (edits.) *Law of the Poor* (1966) 54 Cal.L.Rev. 319-1014; Higgins, *Ardor in the Court* (Mar. 1980) Atlantic, p. 73.)

We may or we may not agree with all or any of those statements. I suggest, though, that they were rationally uttered and that manifestly there is no need to punish the lawyers who—without malice—conclude that such statements are permissible in an appellate brief.[5]

The petitioner apparently believed that his clients were aggrieved on March 30, 1976, by the Court of Appeal's reversal of his superior court victory. He therefore proceeded in federal courts and, one year later, filed his federal appellate brief. Following a State Bar investigation and a preliminary investigation hearing, "on or about August 1, 1977, petitioner wrote a letter to Justices Puglia, Friedman and Regan, apologizing for the language in his reply brief...." That is what the State Bar advised this court (more than three years after his brief became a public record) in its brief filed here on April 14, 1980.

This court, the bar as a whole, and the public would have been better served, I believe, if the conclusion of the first hearing panelists that an admonition here was enough had been respected. Instead their recommendation was set aside; formal procedings were resumed; and countless hours and resources of the bar, of Court of Apppeal justices (see State Bar exhibits Nos. 4 and 5), and of this court were then expended in new proceedings.[6] Allegedly, respect for courts and the profession thereby is preserved and the public protected. Rather, I believe, consci-

---

[5]Cf. *In re Sawyer* (1959) 360 U.S. 622, 628 [3 L.Ed.2d 1473, 1479, 79 S.Ct. 1376]: "We conclude that there is no support for any further factual inference than that petitioner was voicing strong criticism of Smith Act cases and the Government's manner of proving them, and that her references to the happenings at the Honolulu trial were illustrative of this, and not a reflection in any wise upon Judge Wiig personally or his conduct of the trial."

[6]The reporter's transcript totals 153 pages; the briefs, 60; the depositons, 93; and the 2 volumes of exhibits are 1½ inches thick.

entious and zealous counsel once more are warned to watch their manners if they want to avoid trouble. And a large segment of the public, again, may see reason to suspect the vigor with which the interests of *all* Californians may be advocated before the individuals whose duty it is to provide *justice for all.*[7]

### The Punishment

The punishment imposed is not appropriate. It also is inconsistent with the majority's conclusion that "he may well have been motivated by a good faith belief in his clients' position and the need for vigorous action in protecting their claimed rights." (Majority opn., *ante*, p. 413.) Again quoting Business and Professions Code section 6068, subdivision (f), if his written arguments *were* ambiguous and perhaps carelessly so, and if thus he *did* arguably engage in "offensive personality," nonetheless was it not because he believed it might indeed be "required by the justice of the cause with which he [was] charged"?

This final observation seems apt: "Section 6068(f) threatens all lawyers, but it does not threaten all lawyers equally....Insofar as the profession purports to and to some extent does open up to minorities, the poor, and the working class, its implicitly racist and class-based rules of decorum operate, as legal ethics had done for some time, either to eliminate the upstarts or to mold them into conformance with the tastes of the governors....[¶]....The offensive personality statute... applies 'equally' to attorneys for the elite who rarely have reason to lose their composure and to attorneys for the damned who may have to raise their voices to be heard. To suppress offensive speech is absurd to anyone 'who envisions our society in anything but a state of languid repose.' For the powerful and their hangers-on, however, our society *is* in a state of languid repose, or rather it would be if the agitators and troublemakers could somehow be silenced. Those at the top have no need to be offensive. Those at the bottom—the poor, the workers, women, prisoners, criminals, children, and sometimes their lawyers (when they have any)—sometimes speak in less reassuring tones and terms." (Black, *supra*, 31 Hastings L.J. 1097, 1135-1137 [fns. omitted].)

Bird, C. J., and Tobriner, J., concurred.

---

[7]Is it significant, some might ask, that California judges—unlike federal judges—do *not* take an oath that commits them to "Do equal right to the poor and to the rich"?

**BIRD, C. J.,** Dissenting.—I find the sensitivity of the court to the sensibilities of judges quite touching, but if taken to its logical conclusion rather dangerous. With today's decision this court has removed from the protections of the First Amendment any statement by a lawyer commenting on a member of the judiciary.

These are difficult and unpleasant times. The amenities and courtesies of language and demeanor seem to be absent from our social and business environments. One would hope for a kinder and more thoughtful world. However, censorship is not the best method by which to achieve that end.

I might be more sympathetic to the view of my colleagues that we begin the process of censoring the briefs of trial and appellate counsel by threatening them with discipline if our own house were in order. What was said here on behalf of a litigant is not materially different from what some judges and justices have been known to have said about each other or about members of the bar. (See *A lesson in Yiddish* (Aug. 1980) Cal. J., p. 309. See also, for example, the characterizations by justices in their published opinions regarding their fellow justices as collected by Justice Newman in his dis. op., *ante,* at pp. 415, 419.) Does the majority suggest that we begin the process of curtailing the First Amendment rights of judges and justices by filing charges against our colleagues when they use less than judicious language when speaking about each other?

The chilling effect this decision will have on the actions of a lawyer is too high a price to pay for the fragile sensibilities of a judge or justice. Further, it smacks of arrogance to so limit the bar while we ourselves carry on dialogues which match or exceed what was said here.

I respectfully dissent.

Petitioner's application for a rehearing was denied December 10, 1980. Bird, C. J., Tobriner, J., and Newman, J., were of the opinion that the application should be granted.

APPENDIX A

GLENN D. RAMIREZ
ATTORNEY AT LAW
514 WALNUT STREET
P. O. BOX 368
KLAMATH FALLS, OREGON 97601

August 1, 1977

Honorable Robert K. Puglia
Honorable Leonard M. Friedman
Honorable Edwin J. Regan
Judges of the Court of Appeals
Courts and Library Building
Sacramento, California  95814

Dear Judges:

I am writing to apologize for language in my recent Reply Brief which lead counsel for the State Bar Association to conclude that I intended "that the judges received money to render a decision against your client,---". Such was not intended either directly or indirectly. The sole basis of the Terrys' civil rights case against you is that you went beyond the record including transcripts, briefs, and arguments and took away a Court and Jury finding, verdict, and judgment, reinstated a voided security obligation against his property and foreclosed him from a new trial by limiting the issue on retrial to a minor issue which had been substantially qualified in his first trial.

I am extremely sorry for improper innuendo or inferences that may have taken the words used beyond the above intent, and I am this date asking the Clerk of the United States Court of Appeals for permission to delete from the Terrys' Reply Brief, language that would lead to these improper conclusions. My apologies and sorrow goes to you personally and the judicial profession generally, as I personally do not believe that the conclusions drawn by the State Bar Counsel happen except in extremely isolated incidents.

Had these matters been brought to my attention by your counsel, the offending words would have been withdrawn forthwith long ago to have avoided any injurious reference.