STANDING COMMITTEE ON DISCIPLINE OF the UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF CALIFORNIA, Plaintiff–Appellee,

v.

Stephen YAGMAN, Defendant–Appellant.

No. 94–55918.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 2, 1994.

Decided May 30, 1995.

Ramsey Clark, Lawrence W. Schilling, New York City, Marion R. Yagman, Stephen Yagman, Yagman & Yagman, P.C., Venice, CA, for defendant-appellant.

Robert F. Lewis, Graham E. Berry, Michael L. Silk, Michael D. Berger, Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, CA, for plaintiff-appellee.

Ben Margolis, Hugh R. Manes, Los Angeles, CA, for amicus Los Angeles Chapter of the Nat. Lawyers Guild.

Prof. Erwin Chemerinsky, University of Southern Cal. Law Center, Douglas E. Mirell, Los Angeles, Paul L. Hoffman, Gary L. Bostwick, Santa Monica, CA, Michael L. Abrams, Leslie H. Abramson, Scott Altman, E. Thomas Barham, Jr., Michael Bazyler, Thomas E. Beck, Marilyn Bednarski, David A. Binder, Alicia Blanco, Gary L. Blasi, Harland W. Braun, Doreen Braverman, Michael J. Brennan, Jeffrey Brodey, Evan H. Caminker, Robert Carlin, Gerald L. Chaleff, Richard C. Chier, John Wm. Cohn, Sandra Coliver, Donald W. Cook, Roger Cossack, Jeffrey W. Cowan, V. James DeSimone, Roger Jon Diamond, David A. Elden, Susan R. Estrich, Barry A. Fisher, Catherine L. Fisk, Stanley Fleishman, James H. Fosbinder, Frederick D. Friedman, Paul L. Gabbert, Mary Ellen Gale, William J. Genego, Diana Greene Gordon, Jeffrey S. Gordon, Dianna J. Gould–Saltman, Stanley I. Greenberg, Carlton F. Gunn, Kathryn Hirano, Richard G. Hirsch, Robert A. Holtzman, Robert T. Jacobs, Elliott N. Kanter, Steven J. Kaplan, Michael S. Klein, Marvin E. Krakow, Dennis Landin, E. Richard Larson, Karen A. Lash, Joseph P. Lawrence, Leon Letwin, Joel Levine, Raleigh H. Levine, Barrett S. Litt, Karl M. Manheim, Robert F. Mann, Guy R. Mazzeo, Robin Meadow, Carrie J. Menkel–Meadow, Laini Millar–Melnick, Michael R. Mitchell, Hermez Moreno, Michael Nasatir, Robert D. Newman, Jr., Barbara E. O'Connor, Angela E. Oh, Fred Okrand, Robert M. Ornstein, Howard R. Price, Vicki I. Podberesky, Donald M. Re, Irma Rodriguez, Stephen F. Rohde, Richard Alan Rothschild, Alan I. Rubin, D. Kate Rubin, Thomas A. Saenz, Robert Michael Saltzman, Rickard Santwier, Peter A. Schey, Benjamin Schonbrun, Robert A. Schwartz, Gerald V. Scotti, Michael T. Shannon, Janet Schmidt Sherman, Richard G. Sherman, Victor Sherman, Lawrence Solum, Mona C. Soo Hoo, Matthew L. Spitzer, Dan L. Stormer, Marcy Strauss, Michael J. Strumwasser, Barry Tarlow, Maureen Tchakalian, Robert N. Treiman, Eve Triffo, Eugene Volokh, Carol A. Watson, Charles David Weisselberg, Gary C. Williams, Frederic D. Woocher, John Yzurdiaga, Los Angeles, CA, for amicus American Jewish Congress–Pacific Southwest Region, and Article 19.

Before: Charles WIGGINS, Alex KOZINSKI and David R. THOMPSON, Circuit Judges.

Opinion by Judge KOZINSKI; Dissent by Judge WIGGINS.

KOZINSKI, Circuit Judge.

Never far from the center of controversy, outspoken civil rights lawyer Stephen Yagman was suspended from practice before the United States District Court for the Central District of California for impugning the integrity of the court and interfering with the random selection of judges by making disparaging remarks about a judge of that court. We confront several new issues in reviewing this suspension order.

## I

The convoluted history of this case begins in 1991 when Yagman filed a lawsuit pro se against several insurance companies. The case was assigned to Judge Manuel Real, then Chief Judge of the Central District. Yagman promptly sought to disqualify Judge Real on grounds of bias.[1] The disqualification motion was randomly assigned to Judge

---

1. As the basis for this claim, Yagman cited an earlier case where Judge Real had granted a directed verdict against Yagman's clients and thereafter sanctioned Yagman personally in the amount of $250,000. We reversed the sanctions and remanded for reassignment to another judge. *In re Yagman,* 796 F.2d 1165, 1188 (9th Cir.1986). Though we found no evidence that Judge Real harbored any personal animosity toward Yagman, we concluded that reassignment was necessary "to preserve the appearance of justice." *Id.* On remand, Judge Real challenged our authority to reassign the case, and Yagman successfully petitioned for a writ of mandamus. *See Brown v. Baden,* 815 F.2d 575, 576–77 (9th Cir.1987). The matter came to rest when the Supreme Court denied Judge Real's petition for certiorari. *See Real v. Yagman,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987).

William Keller, who denied it, *Yagman v. Republic Ins.*, 136 F.R.D. 652, 657–58 (C.D.Cal.1991), and sanctioned Yagman for pursuing the matter in an "improper and frivolous manner," *Yagman v. Republic Ins.*, 137 F.R.D. 310, 312 (C.D.Cal.1991).[2]

A few days after Judge Keller's sanctions order, Yagman was quoted as saying that Judge Keller "has a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be evidence of anti-semitism." Susan Seager, *Judge Sanctions Yagman, Refers Case to State Bar,* L.A. Daily J., June 6, 1991, at 1. The district court found that Yagman also told the Daily Journal reporter that Judge Keller was "drunk on the bench," although this accusation wasn't published in the article. *See Standing Comm. on Discipline v. Yagman,* 856 F.Supp. 1384, 1386 (C.D.Cal.1994).

Around this time, Yagman received a request from Prentice Hall, publisher of the much-fretted-about Almanac of the Federal Judiciary,[3] for comments in connection with a profile of Judge Keller. Yagman's response was less than complimentary.[4]

A few weeks later, Yagman placed an advertisement (on the stationary of his law firm) in the L.A. Daily Journal, asking lawyers who had been sanctioned by Judge Keller to contact Yagman's office.[5]

Soon after these events, Yagman ran into Robert Steinberg, another attorney who practices in the Central District. According to Steinberg, Yagman told him that, by levelling public criticism at Judge Keller, Yagman hoped to get the judge to recuse himself in future cases.[6] Believing that Yagman was committing misconduct, Steinberg described his conversation with Yagman in a letter to the Standing Committee on Discipline of the U.S. District Court for the Central District of California (the Standing Committee). *See* SER 326.

2. The sanctions order harshly reprimanded Yagman, stating that "neither monetary sanctions nor suspension appear to be effective in deterring Yagman's pestiferous conduct," 137 F.R.D. at 318, and recommended that he be "disciplined appropriately" by the California State Bar, *id.* at 319. On appeal, we affirmed as to disqualification but reversed as to sanctions. *Yagman v. Republic Ins.*, 987 F.2d 622 (9th Cir.1993).

3. The Almanac is a loose-leaf service consisting of profiles of federal judges. Each profile covers the judge's educational and professional background, noteworthy rulings, and anecdotal items of interest. One section—which many judges pretend to ignore but in fact read assiduously—is styled "Lawyers' Evaluation." Perhaps because the comments are published anonymously, they sometimes contain criticism more pungent than judges are accustomed to. Judges who believe the comments do not fairly portray their performance occasionally ask Prentice Hall to seek additional comments; Prentice Hall's letter to Yagman was sent pursuant to such a request. The updated survey indeed produced a more positive—and we believe more accurate—picture of Judge Keller than the original survey. *Compare* 1 Almanac of the Fed.Judiciary 48 (1991–1) *with* 1 Almanac of the Fed.Judiciary 49–50 (1991–2).

4. The portion of the letter relevant here reads as follows:

It is outrageous that the Judge wants his profile redone because he thinks it to be inaccurately harsh in portraying him in a poor light. It is an understatement to characterize the Judge as "the worst judge in the central district." It would be fairer to say that he is ignorant, dishonest, ill-tempered, and a bully, and probably is one of the worst judges in the United States. If television cameras ever were permitted in his courtroom, the other federal judges in the Country would be so embarrassed by this buffoon that they would run for cover. One might believe that some of the reason for this sub-standard human is the recent acrimonious divorce through which he recently went: but talking to attorneys who knew him years ago indicates that, if anything, he has mellowed. One other comment: his girlfriend ..., like the Judge, is a right-wing fanatic.

SER 316 (letter dated June 5, 1991). There's no doubt that Yagman wrote this intemperate letter, though the parties disagree about what Yagman did with it. The district court found that Yagman mailed copies both to Prentice Hall and to Judge Keller, 856 F.Supp. at 1386, and we have no basis for rejecting this finding.

5. The full text of the ad reads: "This office is gathering evidence concerning sanctions imposed by U.S. Dist. Judge William D. Keller. It would be appreciated if any attorney who has been sanctioned, or threatened with sanctions, by Judge Keller fill out the form below and mail it to us. Thank you." SER 380. The record does not disclose whether Yagman received any responses.

6. Though Yagman adamantly denies saying this to Steinberg, the district court heard testimony from both lawyers and believed Steinberg. 856 F.Supp. at 1392.

A few weeks later, the Standing Committee received a letter from Judge Keller describing Yagman's anti-Semitism charge, his inflammatory statements to Prentice Hall and the newspaper advertisement placed by Yagman's law firm. Judge Keller stated that "Mr. Yagman's campaign of harassment and intimidation challenges the integrity of the judicial system. Moreover, there is clear evidence that Mr. Yagman's attacks upon me are motivated by his desire to create a basis for recusing me in any future proceeding." SER 329-30. Judge Keller suggested that "[t]he Standing Committee on Discipline should take action to protect the Court from further abuse." SER 330.

■ After investigating the charges in the two letters, the Standing Committee issued a Petition for Issuance of an Order to Show Cause why Yagman should not be suspended from practice or otherwise disciplined. Pursuant to Central District Local Rule 2.6.4, the matter was then assigned to a panel of three Central District judges, which issued an Order to Show Cause and scheduled a hearing.[7] Prior to the hearing, Yagman raised serious First Amendment objections to being disciplined for criticizing Judge Keller. Both sides requested an opportunity to brief the difficult free speech issues presented, but the district court never acted on these requests. The parties thus proceeded at the hearing without knowing the allocation of the burden of proof or the legal standard the court intended to apply.[8]

During the two-day hearing, the Standing Committee and Yagman put on witnesses and introduced exhibits. In a published opinion issued several months after the hearing, the district court held that Yagman had committed sanctionable misconduct, 856 F.Supp. 1384 (C.D.Cal.1994), and suspended him from practice in the Central District for two years, 856 F.Supp. 1395, 1400 (C.D.Cal. 1994).

## II

The Central District provides a mechanism for judges and others who become aware of attorney misconduct to refer the matter to the Standing Committee, a body of twelve members of the Central District bar. *See* Cent.Dist.Local R. (Civil) 2.6.1, 2.6.3. The Standing Committee reviews the charges and conducts an investigation. If it determines that an attorney deserves discipline, it issues a formal complaint and the case is assigned to a randomly selected panel of three judges. *See* Cent.Dist.Local R. (Civil) 2.6.4. The three-judge panel then holds a hearing on the charges with the committee acting as prosecutor.

■ Yagman challenges the makeup of the Standing Committee on the ground that several of its members had conflicts of interest that could have influenced their decision to pursue disciplinary action against him.[9] Relying principally on *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107

---

**7.** The matter had originally been assigned to a panel of three judges from outside the Central District. After Yagman argued that this assignment violated Local Rule 2.6.4, the out-of-district panel referred the matter back to Chief Judge Real. The matter was then assigned to Central District Judges Rafeedie, Davies and Williams, who presided over all further proceedings.

**8.** Yagman raises other procedural objections to the district court proceedings, among them the lack of any discovery. Though Yagman and the Standing Committee both submitted lengthy discovery requests, the district court denied all discovery without explanation. *See* SER 666, 669. While the district court has broad discretion over discovery matters, the record does not reflect that it exercised that discretion, as it denied all discovery in summary fashion. The court thus appears to have violated Local Rule 2.6.4, which expressly makes the Federal Rules of Civil Proce-

dure applicable to disciplinary proceedings. One of the rules thus made applicable is Fed. R.Civ.P. 26(b), which, subject to some limitations, affords both parties the right to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Because the district court may not disregard the local rules it has promulgated, *see In re Thalheim,* 853 F.2d 383, 386 (5th Cir.1988), it lacked authority to dispense with discovery altogether.

**9.** The Chairman of the Standing Committee, Donald Smaltz, represented Judge Real in *Real v. Yagman. see* n. 1 *supra,* and is alleged to have close personal ties to the former Chief Judge. In addition, Yagman alleges that several of the other committee members have been either defendants or opposing counsel in actions brought by Yagman's clients.

S.Ct. 2124, 95 L.Ed.2d 740 (1987), Yagman argues that this denied him due process.

We find *Young* readily distinguishable. The district court there appointed a private attorney to prosecute the defendant for allegedly violating an injunction protecting Vuitton's trademark. The attorney, however, had represented Vuitton in the civil action which resulted in the injunction, and continued to serve as Vuitton's counsel even as he prosecuted the contempt. He was thus representing two clients with potentially conflicting interests: Vuitton and the United States. The Court noted that by doing so, the attorney was violating ethical standards and a federal criminal law, since he could not "discharge the obligation of undivided loyalty to both clients where both have a direct interest." *Id.* at 805, 107 S.Ct. at 2136. In such situations, the Court concluded, the temptation to use prosecutorial authority to benefit the private client is too great. To avoid such conflicts of interest, the Court held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order." *Id.* at 809, 107 S.Ct. at 2138.

Yagman doesn't contend that any of the Standing Committee lawyers represent Judge Keller (the supposed interested party here), or that Judge Keller stands to benefit from the disciplinary action against Yagman. Nor does he argue that the committee members violated federal law or professional ethical standards. Thus, the concerns undergirding the Court's ruling in *Young* are not implicated. Moreover, even the serious conflict of interest present in *Young* did not result in a denial of due process.[10] Instead, the Court invoked its supervisory authority to prevent federal judges from making appointments that force attorneys to violate

federal law and widely accepted ethical standards. *Id.* at 808–09, 107 S.Ct. at 2138–39.

■ Nor do we find any other support for Yagman's due process claim. The Standing Committee itself has no authority to impose sanctions; whether and to what extent discipline is warranted are matters exclusively within the province of the court. The committee merely assists the district court in maintaining attorney discipline by relieving judges of the awkward responsibility of serving as both prosecutors and arbiters.[11] So long as the judges hearing the misconduct charges are not biased (and Yagman doesn't claim they are), there is no legitimate cause for concern over the composition and partiality of the Standing Committee. *Cf. Wright v. United States,* 732 F.2d 1048, 1058 (2d Cir. 1984) (interested prosecutor's handling of criminal investigation and subsequent trial didn't deprive defendant of due process).

### III

Local Rule 2.5.2 contains two separate prohibitions. First, it enjoins attorneys from engaging in any conduct that "degrades or impugns the integrity of the Court." Second, it provides that "[n]o attorney shall engage in any conduct which ... interferes with the administration of justice." The district court concluded that Yagman violated both prongs of the rule. 856 F.Supp. at 1385. Because different First Amendment standards apply to these two provisions, we discuss the propriety of the sanction under each of them separately.

### A

■ 1. We begin with the portion of Local Rule 2.5.2 prohibiting any conduct that "impugns the integrity of the Court." As the district court recognized, this provision is

---

10. Justice Blackmun alone concluded that appointing an interested party's attorney to prosecute a criminal contempt action violates due process; no other justice would go that far. *See Young,* 481 U.S. at 814–15, 107 S.Ct. at 2141–42 (Blackmun, J., concurring).

11. Given the relatively small size of the Central District bar, it's highly likely that Standing Committee members will have had some dealings (professional or otherwise) with the court's

judges, as well as with the attorneys subject to disciplinary proceedings. The rules nonetheless call for the committee to be drawn from the Central District bar, presumably because those lawyers will be familiar with local practices. The rules thus reflect a judgment that the benefits of having a prosecuting authority composed of one's peers outweigh any resulting loss of independence. We see no constitutional defect in this judgment.

overbroad because it purports to punish a great deal of constitutionally protected speech, including all true statements reflecting adversely on the reputation or character of federal judges. A substantially overbroad restriction on protected speech will be declared facially invalid unless it is "fairly subject to a limiting construction." *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 577, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987).

To save the "impugn the integrity" portion of Rule 2.5.2, the district court read into it an "objective" version of the malice standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Relying on *United States Dist. Ct. v. Sandlin*, 12 F.3d 861 (9th Cir.1993), the court limited Rule 2.5.2 to prohibit only false statements made with either knowledge of their falsity or with reckless disregard as to their truth or falsity, judged from the standpoint of a "reasonable attorney." 856 F.Supp. at 1389–90.

■ *Sandlin* involved a First Amendment challenge to Washington Rule of Professional Conduct 8.2(a), which provided in part: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications, integrity, or record of a judge." *Sandlin*, 12 F.3d at 864. Though the language of the rule closely tracked the *New York Times* malice standard, we held that the purely subjective standard applicable in defamation cases is not suited to attorney disciplinary proceedings. *Id.* at 867. Instead, we held that such proceedings are governed by an objective standard, pursuant to which the court must determine "what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances." *Id.*[12] The inquiry focuses on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made. *Id.*[13]

■ Yagman nonetheless urges application of the *New York Times* subjective malice standard in attorney disciplinary proceedings. *Sandlin* stands firmly in the way. In *Sandlin*, we held that there are significant differences between the interests served by defamation law and those served by rules of professional ethics. Defamation actions seek to remedy an essentially private wrong by compensating individuals for harm caused to their reputation and standing in the community. Ethical rules that prohibit false statements impugning the integrity of judges, by contrast, are not designed to shield judges from unpleasant or offensive criticism, but to preserve public confidence in the fairness and impartiality of our system of justice. *See In re Terry*, 271 Ind. 499, 394 N.E.2d 94, 95 (1979); *In re Graham*, 453 N.W.2d 313, 322 (Minn.1990).

Though attorneys can play an important role in exposing problems with the judicial system, *see Oklahoma ex rel. Oklahoma Bar Ass'n v. Porter*, 766 P.2d 958, 967 (Okla. 1988), *false* statements impugning the integ-

---

**12.** *Sandlin* is consistent with the decisions of most state courts that have considered this issue. *See, e.g., Ramirez v. State Bar*, 28 Cal.3d 402, 169 Cal.Rptr. 206, 211, 619 P.2d 399, 404 (1980); *In re Terry*, 271 Ind. 499, 394 N.E.2d 94, 95–96 (1979); *Louisiana State Bar Ass'n v. Karst*, 428 So.2d 406, 409 (La.1983); *In re Graham*, 453 N.W.2d 313, 321–22 (Minn.1990); *In re Westfall*, 808 S.W.2d 829, 837 (Mo.1991); *In re Holtzman*, 78 N.Y.2d 184, 573 N.Y.S.2d 39, 43, 577 N.E.2d 30, 34 (1991) (per curiam). *But see State Bar v. Semaan*, 508 S.W.2d 429, 432–33 (Tex.Civ.App. 1974) (adopting subjective *New York Times* malice standard).

**13.** This inquiry may take into account whether the attorney pursued readily available avenues of investigation. *Sandlin*, for example, wrongfully accused a district judge of ordering his court reporter to alter the transcript of court proceedings. Though the judge had agreed to let the reporter be deposed, *Sandlin* didn't wait to see what the deposition would disclose before making his accusation. *Sandlin* thus lacked a reasonable factual basis for his accusation because he failed to pursue readily available means of verifying his charge of criminal wrongdoing. 12 F.3d at 867; *see also Ramirez*, 169 Cal.Rptr. at 206, 619 P.2d at 404 (upholding sanction where attorney made false statements about judges based solely on conjecture without investigating whether the allegations were factually substantiated); *Holtzman*, 573 N.Y.S.2d at 41–43, 577 N.E.2d at 32–34 (upholding sanction where attorney falsely accused judge of misconduct during in-chambers meeting before interviewing any of the individuals who were present at the meeting).

rity of a judge erode public confidence without serving to publicize problems that justifiably deserve attention. *Sandlin* held that an objective malice standard strikes a constitutionally permissible balance between an attorney's right to criticize the judiciary and the public's interest in preserving confidence in the judicial system: Lawyers may freely voice criticisms supported by a reasonable factual basis even if they turn out to be mistaken.

 Attorneys who make statements impugning the integrity of a judge are, however, entitled to other First Amendment protections applicable in the defamation context. To begin with, attorneys may be sanctioned for impugning the integrity of a judge or the court only if their statements are false; truth is an absolute defense. *See Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). Moreover, the disciplinary body bears the burden of proving falsity. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986); *Porter*, 766 P.2d at 969.

 It follows that statements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false; statements of opinion are protected by the First Amendment unless they "imply a false assertion of fact." *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990); *Lewis v. Time, Inc.*, 710 F.2d 549, 555 (9th Cir.1983); Restatement (Second) of Torts § 566 (1977) (statement of opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion"). Even statements that at first blush appear to be factual are protected by the First Amendment if they cannot reasonably be interpreted as stating actual facts about their target. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988). Thus, statements of "rhetorical hyperbole" aren't sanctionable,

nor are statements that use language in a "loose, figurative sense." *See National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) (use of word "traitor" could not be construed as representation of fact); *Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970) (use of word "blackmail" could not have been interpreted as charging plaintiff with commission of criminal offense).

With these principles in mind, we examine the statements for which Yagman was disciplined.

 **2.** We first consider Yagman's statement in the Daily Journal that Judge Keller "has a penchant for sanctioning Jewish lawyers: me, David Kenner and Hugh Manes. I find this to be evidence of anti-semitism." [14] Though the district court viewed this entirely as an assertion of fact, 856 F.Supp. at 1391, we conclude that the statement contains both an assertion of fact and an expression of opinion.

Yagman's claim that he, Kenner and Manes are all Jewish and were sanctioned by Judge Keller is clearly a factual assertion: The words have specific, well-defined meanings and describe objectively verifiable matters. Nothing about the context in which the words appear suggests the use of loose, figurative language or "rhetorical hyperbole." Thus, had the Standing Committee proved that Yagman, Kenner or Manes were not sanctioned by Judge Keller, or were not Jewish, this assertion might have formed the basis for discipline. The committee, however, didn't claim that Yagman's factual assertion was false, and the district court made no finding to that effect. We proceed, therefore, on the assumption that this portion of Yagman's statement is true.

The remaining portion of Yagman's Daily Journal statement is best characterized as opinion; it conveys Yagman's personal belief that Judge Keller is anti-Semitic. As such, it may be the basis for sanctions only if it could

---

**14.** Yagman made a similar assertion to Prentice Hall, mentioning three incidents in which Jewish lawyers were sanctioned by Judge Keller and alleging these incidents "back[ed] up the claim" that Judge Keller is anti-Semitic. *See* SER 315.

Our analysis of this assertion does not differ from that of the Daily Journal remark; we focus on the latter because the district court relied on it in imposing sanctions. 856 F.Supp. at 1391.

reasonably be understood as declaring or implying actual facts capable of being proved true or false. *See Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707; *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 727 (1st Cir.1992).

In applying this principle, we are guided by section 566 of the Restatement (Second) of Torts, which distinguishes between two kinds of opinion statements: those based on assumed or expressly stated facts, and those based on implied, undisclosed facts. Restatement (Second) of Torts § 566, cmt. b; *see Lewis,* 710 F.2d at 555 (following the Restatement).[15] The statement, "I think Jones is an alcoholic," for example, is an expression of opinion based on implied facts, *see id.* § 566, cmt. c, illus. 3, because the statement "gives rise to the inference that there are undisclosed facts that justify the forming of the opinion," *id.* § 566, cmt. b. Readers of this statement will reasonably understand the author to be implying he knows facts supporting his view—*e.g.,* that Jones stops at a bar every night after work and has three martinis. If the speaker has no such factual basis for his assertion, the statement is actionable, even though phrased in terms of the author's personal belief.[16]

A statement of opinion based on expressly stated facts, on the other hand, might take the following form: "[Jones] moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair ... with a drink in his hand. I think he must be an alcoholic." *Id.* § 566, cmt. c, illus. 4. This expression of opinion appears to disclose all the facts on which it is based, and does not imply that there are other, unstated facts supporting the belief that Jones is an alcoholic.

A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning. *Lewis,* 710 F.2d at 555–56; Restatement (Second) of Torts § 566, cmt. c ("A simple expression of opinion based on disclosed ... nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is."). The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts. *Phantom Touring,* 953 F.2d at 730; *Lewis,* 710 F.2d at 555. Moreover, "an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea"; readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts. *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir.1985); *see also Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1290 (4th Cir.1987) ("[T]he statement in question readily appears to be nothing more than the author's personal inference from the test results. The premises are explicit, and the reader is by no means required to share [defendant's] conclusion."). A statement of opinion of this sort doesn't "imply a false assertion of fact," *Milkovich,* 497 U.S. at 19,

---

15. The Restatement's view has been widely adopted. *See, e.g., Dunn v. Gannett New York Newspapers, Inc.,* 833 F.2d 446, 453 (3d Cir. 1987); *Orr v. Argus–Press Co.,* 586 F.2d 1108, 1114–15 (6th Cir.1978); *National Ass'n of Gov't Employees, Inc. v. Central Broadcasting Corp.,* 379 Mass. 220, 396 N.E.2d 996, 1000–01 (1979). Although section 566 was drafted before *Milkovich* clarified the famous dictum in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), nothing in *Milkovich* altered the constitutional principles this section articulates. *Phantom Touring,* 953 F.2d at 731 n. 13; *Lyons v. Globe Newspaper Co.,* 415 Mass. 258, 612 N.E.2d 1158, 1164 (1993); *Gross v. New York Times Co.,* 82 N.Y.2d 146, 603 N.Y.S.2d 813, 818, 623 N.E.2d 1163, 1168 (1993).

16. In *Unelko Corp. v. Rooney,* 912 F.2d 1049 (9th Cir.1990), for example, the defendant stated that plaintiff's product "didn't work," without setting forth the factual basis for his opinion. We held that the defendant could be liable for defamation because his statement implied a specific factual assertion: that the product didn't perform the functions listed on the bottle. *Id.* at 1055; *cf. Milkovich,* 497 U.S. at 5 n. 2, 110 S.Ct. at 2698 n. 2 (defendant failed to disclose factual basis for his view that plaintiff lied at court hearing).

110 S.Ct. at 2706, and is thus entitled to full constitutional protection.

We applied this principle in *Lewis v. Time, Inc.*, 710 F.2d 549 (9th Cir.1983), where an attorney claimed he had been defamed by an article calling him a "shady practitioner." We held that this expression of opinion was protected by the First Amendment because the article set forth the facts on which the opinion was based: a judgment entered against the attorney for defrauding his clients, and another judgment holding him liable for malpractice. *Id.* at 556. Because the article's factual assertions were accurate, we concluded that the plaintiff's claim was barred: "[W]here a publication sets forth the facts underlying its statement of opinion ... and those facts are true, the Constitution protects that opinion from liability for defamation." *Id.; see also National Ass'n of Gov't Employees*, 396 N.E.2d at 1000; *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 950, 366 N.E.2d 1299, 1306 (1977).

Yagman's Daily Journal remark is protected by the First Amendment as an expression of opinion based on stated facts. Like the defendant in *Lewis*, Yagman disclosed the basis for his view that Judge Keller is anti-Semitic and has a penchant for sanctioning Jewish lawyers: that he, Kenner and Manes are all Jewish and had been sanctioned by Judge Keller. The statement did not imply the existence of additional, undisclosed facts; it was carefully phrased in terms of an inference drawn from the facts specified rather than a bald accusation of bias against Jews.[17] Readers were "free to form another, perhaps contradictory opinion from the same facts," *Lewis*, 710 F.2d at 555, as no doubt they did.

**3.** The district court also disciplined Yagman for alleging that Judge Keller was "dishonest." This remark appears in the letter Yagman sent to Prentice Hall in connection with the profile of Judge Keller in the Almanac of the Federal Judiciary. *See* n. 4 *supra.* The court concluded that this allegation was sanctionable because it "plainly impl[ies] past improprieties." 856 F.Supp. at 1391. Had Yagman accused Judge Keller of taking bribes, we would agree with the district court. Statements that "could reasonably be understood as imputing specific criminal or other wrongful acts" are not entitled to constitutional protection merely because they are phrased in the form of an opinion. *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir.1980).

When considered in context, however, Yagman's statement cannot reasonably be interpreted as accusing Judge Keller of criminal misconduct. The term "dishonest" was one in a string of colorful adjectives Yagman used to convey the low esteem in which he held Judge Keller. The other terms he used—"ignorant," "ill-tempered," "buffoon," "sub-standard human," "right-wing fanatic," "a bully," "one of the worst judges in the United States"—all speak to competence and temperament rather than corruption; together they convey nothing more substantive than Yagman's contempt for Judge Keller. Viewed in context of these "lusty and imaginative expression[s]," *Letter Carriers*, 418 U.S. at 286, 94 S.Ct. at 2782, the word "dishonest" cannot reasonably be construed as suggesting that Judge Keller had committed specific illegal acts.[18] *See Bresler*, 398 U.S. at 14, 90 S.Ct. at 1541 ("blackmail"). Yagman's remarks are thus statements of rhetorical hyperbole, incapable of being proved true or false. *Cf. In re Erdmann*, 33 N.Y.2d 559, 347 N.Y.S.2d 441, 441, 301 N.E.2d 426, 427 (1973) (reversing sanction against attorney who criticized trial judges for not following the law, and appellate judges for being "the whores who became madams"); *State Bar v.*

---

**17.** Even if Yagman's statement were viewed as a bare allegation of anti-Semitism, it might well qualify for protection under the First Amendment as mere "name-calling." *Cf. Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir.1988) (allegation that plaintiff was a "racist" held not actionable); *Buckley v. Littell*, 539 F.2d 882, 894 (2d Cir.1976) (allegation that plaintiff was a "fascist" held not actionable); *Ward v. Zelikovsky*, 136 N.J. 516, 643 A.2d 972, 983 (1994) (allega-tion that plaintiffs "hate Jews" held not actionable).

**18.** A lawyer accusing a judge of criminal misconduct would use a more pointed term such as "crooked" or "corrupt." *See Rinaldi*, 397 N.Y.S.2d at 951, 366 N.E.2d at 1307 (accusation that judge was "corrupt" not protected because it implied the judge had committed illegal acts).

*Semaan,* 508 S.W.2d 429, 431–32 (Tex.Civ. App.1974) (attorney's observation that judge was "a midget among giants" not sanctionable because it wasn't subject to being proved true or false).

Were we to find any substantive content in Yagman's use of the term "dishonest," we would, at most, construe it to mean "intellectually dishonest"—an accusation that Judge Keller's rulings were overly result-oriented. Intellectual dishonesty is a label lawyers frequently attach to decisions with which they disagree.[19] An allegation that a judge is intellectually dishonest, however, cannot be proved true or false by reference to a "core of objective evidence." *Cf. Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707; *Rooney,* 912 F.2d at 1055. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir.1993). Because Yagman's allegation of "dishonesty" does not imply facts capable of objective verification, it is constitutionally immune from sanctions.

■ 4. Finally, the district court found sanctionable Yagman's allegation that Judge Keller was "drunk on the bench." Yagman contends that, like many of the terms he used in his letter to Prentice Hall, this phrase should be viewed as mere "rhetorical hyperbole." The statement wasn't a part of the string of invective in the Prentice Hall letter, however; it was a remark Yagman allegedly made to a newspaper reporter.[20] Yagman identifies nothing relating to the context in which this statement was made that tends to negate the literal meaning of the words he used. We therefore conclude that Yagman's "drunk on the bench" statement could reasonably be interpreted as suggesting that Judge Keller had actually, on at least one occasion, taken the bench while intoxicated. Unlike Yagman's remarks in his letter to Prentice Hall, this statement implies actual facts that are capable of objective verification. For this reason, the statement isn't protected under *Falwell, Bresler* or *Letter Carriers.*

For Yagman's "drunk on the bench" allegation to serve as the basis for sanctions, however, the Standing Committee had to prove that the statement was false. *See Hepps,* 475 U.S. at 776–77, 106 S.Ct. at 1563–64. This it failed to do; indeed, the committee introduced no evidence at all on the point. While we share the district court's inclination to presume, "[i]n the absence of supporting evidence," that the allegation is untrue, 856 F.Supp. at 1391, the fact remains that the Standing Committee bore the burden of proving Yagman had made a statement that falsely impugned the integrity of the court. By presuming falsity, the district court unconstitutionally relieved the Standing Committee of its duty to produce evidence on an element of its case.[21] Without proof of falsi-

---

19. *See, e.g., The Comeback Kids,* The Recorder, Dec. 29, 1994, at 1 ("[Apple Computer's attorney] call[ed] the Ninth Circuit ruling [in *Apple Computer, Inc. v. Microsoft Corp.*] 'intellectually dishonest' and 'extremely detrimental to the business of the United States.' "); Philip Shenon, *Convictions Reversed in Island Slaying,* N.Y. Times, July 21, 1987, at A1 ("[T]he chief prosecutor in the case[ ] said he would challenge the appeals court's decision, which he described as 'intellectually dishonest.' "); Dawn Weyrich, *Affirmative Action Win Surprises Many,* Wash. Times, June 28, 1990, at A1 ("William Bradford Reynolds … called the ruling [in *Metro Broadcasting, Inc. v. FCC*] 'intellectually dishonest.' 'There is no legal reasoning to justify this decision. Judicial activism has run rampant again,' Mr. Reynolds said.").

20. The primary evidence of this charge consists of testimony from one of Judge Keller's former law clerks. The law clerk testified that a reporter called the chambers seeking comment on Yagman's "drunk on the bench" statement. The witness did not claim he had spoken with the reporter himself; rather, he testified that the reporter spoke to his co-clerk and that he (the witness) happened to be in the room with the co-clerk when the call came in. *See* ER Tab 32, at 35. The witness did not explain how he came to know what the reporter was saying at the remote end of the telephone line, but presumably he was testifying as to what the co-clerk said the reporter said Yagman said.

21. The effect of this error was exacerbated by the fact that the district court did not advise Yagman until after the hearing that he had to carry the burden on this issue. *See* p. 1435 *supra.* The district court thus not only improperly shifted the burden of proof on a key issue to Yagman, but

ty, Yagman's "drunk on the bench" allegation, like the statements discussed above, cannot support the imposition of sanctions for impugning the integrity of the court. *See Porter*, 766 P.2d at 969 (dismissing request for sanctions against attorney where no proof of falsity was introduced).

**B**

As an alternative basis for sanctioning Yagman, the district court concluded that Yagman's statements violated Local Rule 2.5.2's prohibition against engaging in conduct that "interferes with the administration of justice." The court found that Yagman made the statements discussed above in an attempt to "judge-shop"—*i.e.*, to cause Judge Keller to recuse himself in cases where Yagman appeared as counsel.

The Supreme Court has held that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074–75, 111 S.Ct. 2720, 2744–45, 115 L.Ed.2d 888 (1991); *see Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Given the significant burden this rule places on otherwise protected speech, however, the Court has held that prejudice to the administration of justice must be highly likely before speech may be punished.

In a trio of cases involving contempt sanctions imposed against newspapers, the Court articulated the constitutional standard to be applied in this context. Press statements relating to judicial matters may not be restricted, the Court held, unless they pose a "clear and present danger" to the administration of justice. *Craig v. Harney*, 331 U.S. 367, 372, 67 S.Ct. 1249, 1252, 91 L.Ed. 1546 (1947); *Pennekamp v. Florida*, 328 U.S. 331, 348, 66 S.Ct. 1029, 1038, 90 L.Ed. 1295 (1946); *Bridges v. California*, 314 U.S. 252, 260–63, 62 S.Ct. 190, 192–94, 86 L.Ed. 192 (1941). The standard announced in these cases is a demanding one: Statements may be punished only if they "constitute an imminent, not merely a likely, threat to the ad-

ministration of justice. The danger must not be remote or even probable; it must immediately imperil." *Craig*, 331 U.S. at 376, 67 S.Ct. at 1255. There was no clear and present danger in these cases, the Court concluded, because any prospect that press criticism might influence a judge's decision was far too remote. In an oft-quoted passage, the Court noted that "the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate." *Id.*

More recently, the Court held that the "clear and present danger" standard does not apply to statements made by lawyers participating in pending cases. *Gentile*, 501 U.S. at 1075, 111 S.Ct. at 2745. In *Gentile*, the Court concluded that lawyers involved in pending cases may be punished if their out-of-court statements pose merely a "substantial likelihood" of materially prejudicing the fairness of the proceeding. *Id.* The Court gave two principal reasons for adopting this lower threshold, one concerned with the identity of the speaker, the other with the timing of the speech. First, the Court noted, lawyers participating in pending cases have "special access to information through discovery and client communications." *Id.* at 1074, 111 S.Ct. at 2744–45. As a result, their statements pose a heightened threat to the fair administration of justice, "since [they] are likely to be received as especially authoritative." *Id.; see also In re Hinds*, 90 N.J. 604, 449 A.2d 483, 496 (1982) (noting that attorneys participating in pending cases "have confidential information and an intimate knowledge of the merits" of an action, and that their views "are invested with particular credibility and weight in light of their positions"). Second, statements made during the pendency of a case are "likely to influence the actual outcome of the trial" or "prejudice the jury venire, even if an untainted panel can ultimately be found." *Gentile*, 501 U.S. at 1075, 111 S.Ct. at 2745. The Court also noted that restricting the speech of lawyers while they are involved in pending cases does not prohibit speech altogether but "merely postpones the attorneys' comments

also denied him fair notice that he was expected to carry this burden at the hearing.

until after trial." *Id.* at 1076, 111 S.Ct. at 2745.

The Court cited its celebrated decision in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), which reversed the conviction of a criminal defendant whose right to a fair trial had been compromised by excessive, prejudicial publicity stemming from the comments of lawyers and others involved in the trial. That decision, the Court noted, had served as a catalyst for reform efforts aimed at curbing press statements by lawyers involved in judicial proceedings. After *Sheppard,* a majority of states enacted rules restricting the rights of lawyers to comment on matters pending before the courts. *Gentile,* 501 U.S. at 1067–68, 111 S.Ct. at 2740–41.

The Court in *Gentile* thus focused on situations where public statements by lawyers impair the "fair trial rights" of litigants, and discussed at some length the strong governmental interest in limiting prejudicial comments in this context. *See id.* at 1068, 111 S.Ct. at 2741. The Court noted, for example, that litigants are entitled to have their cases decided by "impartial jurors ... based on material admitted into evidence before them in a court proceeding." *Id.* at 1070, 111 S.Ct. at 2742. Extrajudicial statements that might prejudice the jury's consideration of the merits "obviously threaten to undermine this basic tenet." *Id.* Moreover, statements likely to prejudice the fairness of proceedings in a particular case impose significant costs on the judicial system: "Even if a fair trial can ultimately be ensured through *voir dire,* change of venue, or some other device, these measures entail serious costs to the system.... The State has a substantial interest in preventing officers of the court, such as lawyers, from imposing such costs on the judicial system and on the litigants." *Id.* at 1075, 111 S.Ct. at 2745.

 The special considerations identified by *Gentile* are of limited concern when no case is pending before the court. When lawyers speak out on matters unconnected to a pending case, there is no direct and immedi-

ate impact on the fair trial rights of litigants. Information the lawyers impart will not be viewed as coming from confidential sources, and will not have a direct impact on a particular jury venire. Moreover, a speech restriction that is not bounded by a particular trial or other judicial proceeding does far more than merely postpone speech; it permanently inhibits what lawyers may say about the court and its judges—whether their statements are true or false.[22] Much speech of public importance—such as testimony at congressional hearings regarding the temperament and competence of judicial nominees—would be permanently chilled if the rule in *Gentile* were extended beyond the confines of a pending matter. We conclude, therefore, that lawyers' statements unrelated to a matter pending before the court may be sanctioned only if they pose a clear and present danger to the administration of justice. *Accord Hinds,* 449 A.2d at 498.

 The district court found that Yagman's statements interfered with the administration of justice because they were aimed at forcing Judge Keller to recuse himself in cases where Yagman appears as counsel. Judge-shopping doubtless disrupts the proper functioning of the judicial system and may be disciplined. But after conducting an independent examination of the record to ensure that the district court's ruling "does not constitute a forbidden intrusion on the field of free expression," *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (internal quotation marks omitted), we conclude that the sanction imposed here cannot stand.

 Yagman's criticism of Judge Keller was harsh and intemperate, and in no way to be condoned. It has long been established, however, that a party cannot force a judge to recuse himself by engaging in personal attacks on the judge: "Nor can that artifice prevail, which insinuates that the decision of this court will be the effect of personal resentment; for, if it could, every man could

---

22. Local Rule 2.5.2 does not differentiate between true and false statements. We express no view as to the standard applicable to a narrower rule that punishes only false statements which interfere with the administration of justice.

evade the punishment due to his offences, by first pouring a torrent of abuse upon his judges, and then asserting that they act from passion. . . ." *Respublica v. Oswald,* 1 U.S. (1 Dall.) 319, 326, 1 L.Ed. 155 (Pa.1788).[23] Modern courts continue to adhere to this view, and with good reason. *See, e.g., United States v. Studley,* 783 F.2d 934, 939–40 (9th Cir.1986) (litigant's "intemperate and scurrilous attacks" on judge could not compel judge's disqualification); *United States v. Wolfson,* 558 F.2d 59, 62 (2d Cir.1977) (defendant's unfounded charges of misconduct against judge didn't require disqualification, because defendant's remarks "only establish[ed his] feelings towards [the judge], not the reverse").

■ Criticism from a party's attorney creates an even remoter danger that a judge will disqualify himself because the federal recusal statutes, in all but the most extreme circumstances, require a showing that the judge is (or appears to be) biased or prejudiced against a party, not counsel. *United States v. Burt,* 765 F.2d 1364, 1368 (9th Cir.1985); *see also In re Beard,* 811 F.2d 818, 830 (4th Cir.1987); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1398–99 (8th Cir.1983). Were it otherwise, courts have cautioned, "[l]awyers, once in a controversy with a judge, would have a license under which the judge would serve at their will," *Davis v. Board of Sch. Comm'rs,* 517 F.2d 1044, 1050 (5th Cir.1975), and any "party wishing to rid himself of the assigned judge would need only hire a lawyer with a certified record of abusive criticisms of that judge," *United States v. Helmsley,* 760 F.Supp. 338, 343

(S.D.N.Y.1991), *aff'd,* 963 F.2d 1522 (2d Cir. 1992).

■ Notwithstanding this well-settled rule, judges occasionally do remove themselves voluntarily from cases as a result of harsh criticism from attorneys.[24] As the district court recognized, then, a lawyer's vociferous criticism of a judge could interfere with the random assignment of judges. But a mere possibility—or even the probability—of harm does not amount to a clear and present danger: "The danger must not be remote or even probable; it must immediately imperil." *Craig,* 331 U.S. at 376, 67 S.Ct. at 1255. The "substantive evil must be extremely serious and the degree of imminence must be extremely high before utterances can be punished" under the First Amendment. *Bridges,* 314 U.S. at 263, 62 S.Ct. at 194.

We conclude that "the danger under this record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment." *Pennekamp,* 328 U.S. at 350, 66 S.Ct. at 1039. As noted above, firm and long-standing precedent establishes that unflattering remarks like Yagman's cannot force the disqualification of the judge at whom they are aimed. The question remains whether the possibility of voluntary recusal is so great as to amount to a clear and present danger. We believe it is not. Public criticism of judges and the decisions they make is not unusual, *see, e.g.,* n. 19 *supra,* yet this seldom leads to judicial recusal. Judge Real, for example, despite receiving harsh criticism from Yagman, did not recuse himself in *Yagman v. Republic Ins.,* where Yagman was not merely the lawyer but also a party to the

---

**23.** Why, the perceptive reader may wonder, does an opinion of the Pennsylvania Supreme Court appear in the first volume of U.S. Reports? *See* Craig Joyce, *The Rise of the Supreme Court Reporter: An Institutional Perspective on Marshall Court Ascendancy,* 83 Mich.L.Rev. 1291, 1295–96 (1985).

**24.** Chief Justice Rehnquist, for example, has declined to participate in some cases where James Brosnahan appeared as counsel, leading to speculation that Brosnahan's criticism of the Chief Justice during his 1986 confirmation hearings may have been the reason. *See, e.g.,* Tony Mauro, *The Justices' Imperial Code of Silence,* Legal

Times, Feb. 9, 1987, at 9. Similarly, press reports have suggested that Second Circuit Judge John Walker removed himself from post-trial proceedings in the Leona Helmsley case because of harsh criticism he had received during Senate confirmation hearings from Helmsley's counsel, Harvard Law Professor Alan Dershowitz. *See* Tony Mauro, *The Thomas Recusal Question,* Tex. Law., Apr. 19, 1993, at 18. Closer to home, one Central District judge has decided to recuse himself in all cases where Yagman appears as counsel, after Yagman made baseless allegations against the judge. *See Yagman,* 856 F.Supp. at 1393.

proceedings.[25] Federal judges are well aware that "[s]ervice as a public official means that one may not be viewed favorably by every member of the public," and that they've been granted "the extraordinary protections of life tenure to shield them from such pressures." *In re Bernard,* 31 F.3d 842, 846 n. 8 (9th Cir.1994) (single judge opinion). Because Yagman's statements do not pose a clear and present danger to the proper functioning of the courts, we conclude that the district court erred in sanctioning Yagman for interfering with the administration of justice.

### Conclusion

We can't improve on the words of Justice Black in *Bridges,* 314 U.S. at 270–71, 62 S.Ct. at 197–98 (footnote omitted):

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

**REVERSED.**

WIGGINS, Circuit Judge, dissenting.

I respectfully dissent.

---

**25.** The district court noted that, after Yagman made the remarks at issue, Judge Keller did disqualify himself in one of Yagman's cases. 856 F.Supp. at 1394 n. 13. Although Judge Keller stated that his recusal was motivated by the fact that he had referred Yagman for discipline rather than by Yagman's criticism, *see id.* at 1387, this is beside the point. Our inquiry focuses on objective probabilities: the extent to which the statements in question would be likely to cause a judge of average fortitude to disqualify himself. As the Court noted in *Pennekamp,* "[t]he law deals in generalities and external standards and cannot depend on the varying degrees of moral courage or stability in the face of criticism which individual judges may possess...." 328 U.S. at 348, 66 S.Ct. at 1038.