UNITED STATES of America,
Plaintiff,

v.

Shawn Lee MALMSBERRY,
Defendants.

No. 6:97–CR–72–ORL–18JGG.

United States District Court,
M.D. Florida,
Orlando Division.

May 29, 2002.

Gregory N. Miller, U.S. Attorney's Office, Orlando, FL, for U.S.

Joel T. Remland, Federal Public Defender's Office, Orlando, FL, for defendant.

## REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

## TO THE UNITED STATES DISTRICT COURT

On March 5—6, 2002, this Court heard evidence at a final revocation hearing on the Petition on Supervised Release filed March 16, 2001 [Docket No. 48]. *See* Fed. R. Cr. P. 32.1 (revocation of supervised release); 18 U.S.C. § 3583(e) (revocation of supervised release); 18 U.S.C. § 3401(i) (designation of magistrate judge to conduct revocation hearing); Local Rule 6.01(c)(16) (delegation of magistrate judge to prepare report and recommendation). For the reasons that follow, it is **RECOMMENDED** that the United States District Court issue an order to show cause why defendant Shawn Lee Malmsberry's supervised release should not be revoked.

## I. *THE FACTS*

On April 24, 1997, Malmsberry signed and filed a plea agreement. Docket No. 22. Malmsberry pled guilty to possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). Docket No. 22. On August 27, 1997, the Honorable G. Kendall Sharp sentenced Malmsberry to 44 months imprisonment, followed by three years of supervised release. Docket No. 44, 45. The district court also placed restrictions on Malmsberry's supervised release. Docket No. 45. Relevant here, the district court imposed standard conditions of supervised release requiring that Malmsberry not commit another Federal, State, or local crime, and requiring that Malmsberry notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. Docket No. 45 at 3.

Malmsberry's three-year term of supervised release began on June 5, 2000. Docket No. 47. On August 9, 2000, Malmsberry tested positive for the use of marijuana, and Judge Sharp modified the conditions of supervised release to include drug treatment. Docket No. 47. Urinalysis since August 9, 2000 has proved negative for the use of drugs.

On March 15, 2001, the United States Probation Office Joel L. Wells filed a Petition for Warrant for Offender Under Supervision [Docket No. 48] alleging that Malmsberry had violated the terms of his supervised release as follows:

On or about February 4, 2001, Shawn Malmsberry committed the offense of Aggravated Stalking [as to Susan Bollinger and Jason Bollinger in violation of Fla. Stat. § 784.048(3)] in Osceola County, Florida....

On December 15, 2000, Malmsberry committed the offense of Battery [as to Cindy Brown in violation of Fla. Stat. § 784.03] and Contributing to the Delinquency or Dependency of a Minor [as to Cole Malmsberry, son of Shawn Malmsberry and Cindy Cole, in violation of Fla. Stat. § 827.04] in Brevard County, Florida....

On December 15, 2000, Malmsberry was questioned by Officer Chris Van Zandt of the Palm Bay Police Department and did not report this questioning by a law

enforcement of officer to the Probation Officer within 72 hours as required. . . . On October 24, 2000, Malmsberry was questioned by Officer Steve White of the Palm Bay Police department and did not report this questioning by a law enforcement officer to the Probation Office within seventy-two hours as required. . . .

Docket No. 48 (references to violated conditions omitted; references to alleged victims and statutes supplied in brackets).

A state criminal jury trial against Malmsberry ended on February 5, 2002. *Florida v. Shawn Lee Malmsberry*, No. CR01–309A, Docket No. 60, Exhibit 1. An Osceola County jury found defendant Malmsberry not guilty of Count One, Aggravated Stalking [of Susan Bollinger] With a Credible Threat [Fla. Stat. § 784.048(3) ], as well as not guilty of the lesser included offense of stalking. Docket No. 60, Exhibit 1. The State Attorney filed a notice of *nolle prosequi* dismissing Count Two, Aggravated Stalking [of Jason Bollinger, Susan Bollinger's son]. *Id.*

On February 12, 2002, the Court conducted a full evidentiary hearing on the government's motion to detain Malmsberry in connection with the federal charge that he had violated the conditions of his supervised release. Transcript at Docket No. 65; Minutes at Docket No. 58. Malmsberry testified at the detention hearing. Docket No. 65 at 76—87. At the conclusion of the hearing, the Court recited Malmsberry's "enormous," "massive and lengthy" criminal history. Docket No. 65 at 90—93, 95. The Court noted that Malmsberry had been on probation at the

time of his offense of conviction, and observed that two women had obtained court restraining orders against Malmsberry for threatening conduct. The Court concluded that Malmsberry had not met his burden under Fed. R. Cr. P. 46(c), Fed. R. Cr. P. 32.1(a), and 18 U.S.C. § 3143 of proving that he is not likely to flee or pose a danger to the safety of the community if released on bond.[1] Docket No. 65 at 90. The Court therefore detained Malmsberry pending the final revocation hearing. Docket No. 61.

On February 28, 2002, Malmsberry filed his first motion seeking the recusal of the undersigned magistrate judge (Judge Glazebrook) under 28 U.S.C. § 455(a). Docket No. 62. At Malmsberry's detention hearing, Judge Glazebrook had made adverse credibility rulings about the very witnesses whom Malmsberry would be relying on to support his defense to the aggravated stalking charge. Docket No. 62. The government opposed the motion to recuse on the ground that a credibility determination in a prior judicial proceeding does not amount to the kind of personal, pervasive, *extrajudicial* bias or prejudice that results in recusal. Docket No. 64.

The Court conducted a two-day revocation hearing on March 5—6, 2002. Docket Nos. 67, 69, 75, 76. At the beginning of the hearing, the Court heard oral argument on Malmsberry's motion to recuse. Docket No. 63, 76 at 2—22. With Malmsberry present in the courtroom, counsel for Malmsberry argued that the magistrate judge should recuse himself even

---

1. A person on supervised release may be released pursuant to Fed. R. Cr. P. 46(c) pending the revocation hearing. *See* Fed. R. Cr. P. 32.1(a). Eligibility for release shall be in accordance with 18 U.S.C. § 3143 (applicable to release pending sentence). The burden of establishing that the defendant will not flee or pose a danger to the community rests with

the defendant. Fed. R. Cr. P. 46(c). Section 3143(a) requires that the magistrate **shall** order that the defendant be detained unless he or she finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of the community if released under 18 U.S.C. 3142(b) or (c) (preferred conditions).

though the law normally required proof of *extrajudicial* bias or prejudice. Counsel for Malmsberry explained "extrajudicial" as "meaning that the Court, from its private life, has brought something into the courtroom that might prejudice the Court against one party or another." Docket No. 76 at 3.

Counsel for Malmsberry did not claim that the Court had relied on knowledge acquired outside the legal proceedings. Counsel retreated from squarely alleging that, as a result of the credibility rulings, the Court had a personal "deep-seated and unequivocal antagonism which would render fair judgment impossible." Docket No. 76 at 18—19. Rather, counsel claimed that the defendant had met the test for recusal under 28 U.S.C. § 455(a) because the Court's prior credibility decision now required the defendant to "change" the Court's mind. After a lengthy dialog about the test for when impartiality might reasonably be questioned (and whether *extrajudicial* bias was required), the Court denied the motion to recuse. Docket No. 76 at 21—22.

The Court heard the testimony of several witnesses in connection with the violation charges: Susan Bollinger, Angela Wynn Lanhan, Police Officer Steven White, Police Officer Craig Pattison, Police Officer Christian Van Zandt, Roger Davis, United State Probation Officer William Lester, Robert Wilson Bair, and Beverly Jean Maffey. Transcript at Docket Nos. 75—76. Malmsberry testified, and denied violating the conditions of his supervised release. Docket No. 75 at 119—44. The Court received exhibits. Docket Nos. 70, 71. At the conclusion of the hearing, the Court took the matter under advisement,

and ordered the transcript of the final revocation hearing for a closer examination. Docket No. 75 at 171—72.

On March 25, 2002, Malmsberry filed a motion to reopen the final revocation hearing to admit exculpatory evidence. Docket No. 72. On April 5, 2002, the Court granted the motion in part as to the admission and consideration of the additional evidence, and otherwise denied the motion as to further court proceedings apart from the argument presented in Malmsberry's March 25, 2002 motion. Docket No. 74. The court reporter filed the transcripts of the revocation hearing on April 16, 2002. Docket Nos. 75, 76.

On Friday, May 3, 2002, the United States Marshal's Service informed Judge Glazebrook of an alleged death threat. According to a jail inmate, Malmsberry had threatened to kidnap and torture a member of Judge Glazebrook's family, and to shoot and kill Judge Glazebrook. Although Malmsberry remained in jail, Malmsberry allegedly told the inmate that the Dragons, a motorcycle gang, would do anything he asked of them. According to the inmate, Malmsberry wanted to kill Judge Glazebrook because he still had Malmsberry incarcerated after he had won his stalking case in state court. The inmate reported the threat to the FBI.[2]

On invitation of the Court [Docket No. 77], Malmsberry filed a second motion for recusal. Docket No. 78. In his motion, and at the oral argument on the motion to recuse held on May 24, 2002, Malmsberry (through his counsel) vigorously denied that he had ever threatened Judge Glazebrook or any member of his family. Docket No. 78 at 2. Acknowledging that a de-

---

**2.** According to the inmate, Malmsberry also threatened to kill Susan and Jason Bollinger. Of course, the Court completely disregards the inmate's allegation in ruling on the matters contained in this order. The inmate's

letter to the FBI, which the government shared with the Court and counsel for Malmsberry, is not part of the record. It is being filed under seal in the event of appellate review.

fendant may not obtain recusal by making threats, counsel for Malmsberry argued that the rule does not apply to Malmsberry because he made no threats. Docket No. 78 at 5.

## II. RECUSAL

### A. Disqualification Under 28 U.S.C. § 455(a)

Section 455 (a) of 28 U.S.C. states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The goal of section 455(a) is to avoid even the appearance of partiality. Actual bias is not necessary; the appearance of bias is adequate to trigger recusal under § 455. *See Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

■ The standard is whether a judge should disqualify himself because a reasonable person, fully informed of the relevant facts, would question the judge's impartiality. *Parrish v. Board of Commissioners*, 524 F.2d 98, 103 (5th Cir.1975) (holding that § 455(a) involves a "reasonable man test"); *Pepsico, Inc. v. McMillen*, 764 F.2d 458 (7th Cir.1985). If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation, then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case, or because the judge is pure in heart and incorruptible. *Liljeberg, Jr., v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988).

■ Section 455 (a), however, must not be construed so broadly that it becomes presumptive, and recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice. *Franks v. Nimmo*, 796 F.2d 1230, 1235

(10th Cir.1986). Neither is the statute intended to bestow a veto power over judges, or to permit "judge-shopping." *United States v. Greenspan*, 26 F.3d 1001 (10th Cir.1994); *United States v. Cooley*, 1 F.3d 985 (10th Cir.1993). Disqualification is not warranted merely by a litigant's intemperate and scurrilous attacks. *United States v. Studley*, 783 F.2d 934 (9th Cir.1986); *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir.1977). It has long been established that a party cannot force a judge to recuse himself by engaging in personal attacks on the judge. Otherwise, "every man could evade the punishment due to his offense, by first pouring a torrent of abuse upon his judges, and then asserting that they act from passion." *Standing Committee v. Yagman*, 55 F.3d 1430, 1443—44 (9th Cir.1995). *See also United States v. Wolfson*, 558 F.2d 59, 62 (2d Cir.1977) (defendant's unfounded charges of misconduct against judge did not require disqualification because defendant's remarks established only the defendant's feelings towards the judge, and not the reverse).

■ Further, a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require. *Greenspan*, 26 F.3d at 1005; *In re American Ready Mix, Inc.*, 14 F.3d at 1501; *Hinman*, 831 F.2d at 939. The Tenth Circuit compiled a non-exhaustive list of matters not ordinarily sufficient to require § 455(a) recusal:

(1) Rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters; (2) the mere fact that a judge has previously expressed an opinion on a point of law or has expressed a dedication to upholding the law or a determination to impose severe punishment within the limits of the law upon those found guilty of a particular offense; (3) prior rulings in

the proceeding, or another proceeding, solely because they were adverse; (4) mere familiarity with the defendant(s), or the type of charge, or kind of defense presented; (5) baseless personal attacks on or suits against the judge by a party; (6) reporters' personal opinions or characterizations appearing in the media, media notoriety, and reports in the media purporting to be factual, such as quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading; and (7) *threats or other attempts to intimidate the judge.*

*Cooley,* 1 F.3d at 993—94 (emphasis added).

■ Cases within § 455(a) are extremely fact driven, and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir.1995). If the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal. *United States v. Dandy,* 998 F.2d 1344, 1349 (6th Cir.1993). Of course, a judge's impartiality might reasonably be questioned where the defendant has in fact carried out a plan to kill the judge. *See Nichols v. Alley,* 71 F.3d 347 (10th Cir.1995) (defendant Terry Nichols participated in bombing of Oklahoma City federal building which destroyed the judge's chambers and courtroom); *United States v. Cerrella,* 529 F.Supp. 1373 (S.D.Fla.1982) (defendant not only threatened to kill Judge Roettger, but also let a contract to kill him). Grounds for recusal are not limited to death threats. *See United States v. Cooley,* 1 F.3d 985 (10th Cir.1993) (district judge's impartiality might reasonably be questioned in light of

judge's interview by Barbara Walters on Nightline about abortion clinic protests).

### B. Analysis on Recusal

The undersigned has no personal bias or prejudice concerning Malmsberry, and no personal knowledge of disputed evidentiary facts concerning the violation proceeding. *See* 28 U.S.C. § 455(b)(1). Neither is the violation proceeding one in which Judge Glazebrook's impartiality might reasonably be questioned. *See* 28 U.S.C. § 455(a). Malmsberry vigorously denies having made a threat. Judge Glazebrook knows only hearsay information to the contrary—the statement of a jail inmate of unknown reliability made to the FBI, probably in hopes of gaining substantial assistance.

■ Even if the Court were to assume that Malmsberry made the threat, a reasonable person, fully informed of the relevant facts, would not question the judge's impartiality in the violation proceeding. A defendant cannot use death threats to force the recusal of a judge who has detained him in hopes that another judge might rule differently. Similarly, a defendant whose first attempt to dislodge the presiding magistrate judge has failed, cannot create the appearance of an *extrajudicial* or personal bias or prejudice by making personal threats against a judge's family. Under the facts presented here, the judge has a duty to sit. Malmsberry's violation proceeding is not one in which Judge Glazebrook's impartiality might reasonably be questioned under 28 U.S.C. § 455(a). Therefore the Court has denied Malmsberry's second motion for recusal [Docket No. 78].[3]

---

**3.** The Court has entered an endorsed order denying the motion to recuse [Docket No. 78]. No report and recommendation is required to deny a motion to recuse. *See* Local Rule 6.01(c)(14). This order serves as a memorandum of decision regarding the reasons for the ruling.

## III. VIOLATION OF SUPERVISED RELEASE

### A. The Standard for Violation of Supervised Release

When a person is charged with violating a condition of his supervised release, the Court conducts a revocation hearing pursuant to Fed. R. Cr. P. 32.1(a)(2). Where the Court finds by a preponderance of the evidence that the defendant committed the violations alleged, the Court may revoke supervised release. *See* 18 U.S.C. § 3583(e)(3). The quantum of proof is not guilt beyond a reasonable doubt. *Id.*

### B. The Elements of the Florida Law Violations

The parties agree that the applicable law is as follows. Pursuant to Fla. Stat. § 784.048(3), any person who willfully, maliciously, and repeatedly follows or harasses another person and makes a credible threat with the intent to place that person in reasonable fear of death or bodily injury, commits the offense of aggravated stalking. Under Florida law, aggravated stalking is a third degree felony.

To prove aggravated stalking in violation of Florida law, the government must show[4] that: 1.) the defendant willfully, maliciously, and repeatedly followed or harassed the victim; and 2.) the defendant made a credible threat with the intent to place the victim in reasonable fear of death or bodily injury. "Harass" means to engage in a course of conduct directed at a specific person that causes substantial emotional distress in such person, and serves no legitimate purpose. "Credible threat" means a threat made with the intent to cause the person who is the target of the threat to reasonably fear for his or her safety. The threat must be against the life of, or a threat to cause bodily injury to, a person. *See* Fla. Standard Crim. Jury Instruction No. 122.

To prove battery in violation of Fla Stat. § 784.03, the government must show that: 1.) the defendant intentionally touched or struck the victim against his or her will; or 2.) the defendant intentionally caused bodily harm to the victim. *See* Fla. Standard Crim. Jury Instruction No. 121.

To prove the charge of Contributing to Child Delinquency or Dependency or to Child in Need of Services in violation of Fla. Stat. § 827.04, the government must prove that the defendant either 1.) committed an act which caused, tended to cause, encouraged, or contributed to a child becoming a child in need of services; or 2.) induced or attempted to induce, by act, threat, command, or persuasion, a child to live in a manner that tends to cause such child to become or to remain a child in need of services. Fla. Stat. § 827.04; *see also* Fla. Standard Crim. Jury Instruction No. 231.

The term "child in need of services" means a child for whom there is no pending investigation, and the child has persistently run away, been habitually truant, or persistently disobeyed reasonable and lawful demands. Fla. Stat. § 984.03(9). The offense is a first degree misdemeanor under Fla. Stat. §§ 775.082, 775.083. The statute has been held unconstitutionally vague by the Fifth District Court of Appeal of Florida, but found to be constitutional by the Florida Supreme Court. *Florida v. Fuchs,* 751 So.2d 603, 604—05 (Fla.App.5th DCA 1999), *rev'd,* 769 So.2d 1006 (Fla.2000).

### C. Findings of Fact on Charged Violations

Shawn Malmsberry's relationship with Cindy Brown, his girlfriend, has been tu-

---

4. In the context of a violation of supervised release, the proof must be by a preponder-ance of the evidence. *See* 18 U.S.C. § 3583(e)(3).

multuous since his release from prison on June 5, 2000. The police were summoned on two occasions due to domestic violence complaints against Malmsberry. Malmsberry failed to notify the probation office of questioning by the police.

### 1. Failure to Report October 24, 2000 Questioning About Fight with Cindy Brown at Work

The first incident occurred on October 24, 2000. Cindy Brown called the Palm Bay Police Department from her place of employment. She and Malmsberry, the her ex-boyfriend, had a verbal fight in the parking lot at her workplace. They were fighting about their relationship and their nine-year-old son, Cole Malmsberry. Docket No. 76 at 96; Docket No. 75 at 128. Palm Bay Police Officer Steve White responded to Brown's domestic disturbance call as the disturbance was still in progress. Docket No. 76 at 85. Brown was distraught, very emotional, and crying. Docket No. 76 at 85. Officer White prepared a report of the incident. Docket No. 76 at 84—85, 95—96; GX 4.

While Officer White was speaking with Brown, Malmsberry repeatedly telephoned the business and asked to speak with Brown. Docket No. 76 at 97. Officer White spoke with Malmsberry, who was very upset. Officer White asked Malmsberry questions about his argument with Brown.[5] Malmsberry confirmed that he and Cindy Brown had been yelling and screaming in the parking lot, but said there was nothing physical. Docket No. 76 at 97. Officer White referred Brown to a Domestic Violence Advocate, who spoke to her by telephone.

United States Probation Officer William Lester had instructed Malmsberry that all contacts with law enforcement officer must be reported in order to eliminate all gray area in the term "questioning." Docket No. 75 at 57—59. Malmsberry never informed his probation officer of questioning by Officer White. Docket No. 75 at 57—62; GX 1 -3. Malmsberry never reported the questioning on his monthly report, even though the report specifically asks "Was anyone in your household . . . questioned by a law enforcement officer?"[6] Docket No. 75 at 57—62; GX 2—3. Malmsberry answered "no." GX 2—3.

### 2. December 15, 2000 Battery on Cindy Brown at Home

The second incident occurred on December 15, 2000 at 778 Badger Drive. Cole Malmsberry, the nine-year-old son of Cindy Brown and Shawn Malmsberry, called 911 to report a battery in progress at his residence. Docket No. 76 at 102, 131. Palm Bay Police Officer Craig T. Pattison responded with blue lights and siren, and stopped Cindy Brown's car as she drove away from the residence. Brown was highly emotional, very erratic, crying, and extremely difficult to calm down. Docket No. 76 at 104. She was talking on the cell phone with Shawn Malmsberry. Officer Pattison followed her back to the residence. Docket No. 76 at 104. At the house, a chair had been thrown, and Christmas lights had been pulled down.

The cell phone rang eight times in Brown's truck while Officer Pattison was speaking with her, and the telephone at home rang dozens of times. Docket No. 76 at 106, 120, 140. The answering ma-

---

**5.** Malmsberry testified that he did not know he was talking to a police officer, and that the man he spoke with did not try to question him. Docket No. 75 at 128.

**6.** According to United States Probation Officer William Lester, Malmsberry displayed a bitter attitude towards the Federal system, and an arrogance about completing supervision. Docket No. 75 at 66.

chine would pick up, and a man admitting to being "Shawn" would yell at Brown in an angry voice, telling her that the police were feeding her "bullshit." Docket No. 76 at 107, 140; Docket No. 75 at 140. Officer Pattison recorded the voice on his micro-cassette. Docket No. 76 at 108—09; GX 6, 6A.

Palm Bay Police Officer Christian Van Zandt also responded in emergency mode to the battery in progress. Docket No. 76 at 132. He interviewed Cole Malmsberry at 778 Badger Drive. Cole was very upset, and said there had been a fight. His father had thrown a chair against the wall, and had torn down the Christmas lights on the way out. Docket No. 76 at 139. While crying, Cole told Officer Van Zandt in rapid-fire bits and pieces that his father had thrown a chair at his mother, breaking it, and also attempted to bite his mother in the face, or maybe just pull her close, before fleeing. Docket No. 76 at 165. Cole told Officer Van Zandt something about his father pushing or hitting his mother before he left. Docket No. 76 at 139. Cole said there had been a tussle, or physical contact. Brown said that Malmsberry had yelled at her in their bedroom, and pulled her hair.[7] Docket No. 76 at 167; GX 5 at one of two; Docket No. 75 at 154.

Officer Van Zandt tried to get Malmsberry to return to the residence so that he could ask him about the his side of the matter. Docket No. 76 at 110, 140—41. Malmsberry made a few defensive remarks to Officer Van Zandt on the telephone, but mainly screamed and cursed belligerently at Officer Van Zandt, calling him names and demanding to talk to Cole.[8] Docket No. 76 at 141—42. Officer Van Zandt told Malmsberry that he needed to return so he could speak to him, but Malmsberry did not obey. Docket No. 76 at 142. Brown was very fearful when Malmsberry called. Malmsberry threatened Officer Van Zandt, saying that he was around the corner, and that they had better watch their backs.[9] Docket No. 76 at 143. Van Zandt called in additional officers as backup. The officers prepared an offense incident report. GX 5.

On February 13, 2001, a state judge granted Cindy Brown a permanent injunction for protection against Malmsberry. On February 15, 2001, the State Attorney filed misdemeanor charges against Malmsberry (Battery and Contributing to the Delinquency of Dependency of a Minor).

On questioning by the Court about the status of Florida law regarding vagueness in light of *State v. Fuchs*, 751 So.2d 603, 604—05 (Fla.App.5th DCA 1999), *rev'd*, 769 So.2d 1006 (Fla.2000), the government

---

7. Officer Van Zandt could not recall Brown's statement independently of his police report. In Malmsberry's testimony at the violation hearing, Malmsberry denied any physical contact with Cindy Brown. He said that Brown put her forehead up to his because "that was a term of endearment to get head to head and holler at each other." Docket No. 75 at 129. Malmsberry said that he lost his temper and kicked the chair, and it went skidding across the kitchen floor. Docket No. 75 at 129—30. According to Malmsberry, Cole came into the room when he kicked the chair, and Malmsberry left immediately, pulling down a ten-foot section of Christmas lights in anger on his way out. *Id.*

8. Malmsberry testified that somebody other than Cindy Brown answered the telephone about ten times. About the second or third time, he realized that the person was a police officer, but that the officer did not ask him any questions. Docket No. 75 at 131—32. Malmsberry knew that he had to report any questioning, but he testified that he did not feel that he had been questioned. Docket No. 75 at 135.

9. Malmsberry denied making the threat. Docket No. 75 at 132—33.

moved to dismiss the charge of Contributing to the Delinquency of a Minor (but not as to Battery). Docket No. 75 at 155—60. The Court permitted the dismissal. *Id.*

In conclusion, the Court finds by a preponderance of the evidence that Malmsberry committed battery on Cindy Brown in violation of Fla Stat. § 784.03. From the totality of the circumstances, it appears that Malmsberry intentionally touched Cindy Brown against her will. Furthermore, Malmsberry never informed his probation officer about his contact with law enforcement officers on December 15, 2000, Docket No. 75 at 57—62; GX 2—3, even though United States Probation Officer William Lester had instructed Malmsberry that all contacts with law enforcement officers must be reported. Docket No. 75 at 57—59.

### 3. *Aggravated Stalking of Susan and Jason Bollinger Around February 4, 2001*

Susan Bollinger is a 45 year old woman from Bull Creek, Florida, who has five children. Docket No. 75 at 3. Susan Bollinger's oldest son, Jason Bollinger, lived with Cindy Brown while Shawn Malmsberry was in federal prison. Docket No. 75 at 5. Susan Bollinger has known Shawn Malmsberry, who lives nearby, for nine or ten years.

Malmsberry began his supervised release on June 5, 2000. Docket No. 48 at 1; Docket No. 75 at 54. Shortly after his release from prison, Malmsberry started calling Susan Bollinger and leaving messages at her home. Docket No. 75 at 6. She returned some of his calls. Malms-

berry continued to make the calls over a six or seven month period, until about January or February 2001. Docket No. 75 at 7—8. Bollinger estimated that Malmsberry called one hundred times, and that she either spoke with him or heard messages from him 40 or 50 times. Docket No. 75 at 8.

Malmsberry told Susan Bollinger that he was going to kill her son, or beat the hell out of him and mutilate him so that she would not recognize him. Malmsberry tried to get Bollinger to say where her son lived. Docket No. 75 at 7. When he called, Malmsberry sounded angry or distraught—"just crazy." Malmsberry would scream, use profanity, and act belligerant.[10] Malmsberry accused Bollinger of making up "a bunch of lies" about him, falsifying a police report. He told Bollinger that "I had people listening to you last night ..." DX1, 3. Bollinger lived down a six-mile dirt road. Malmsberry left messages on Bollinger's answering machine telling her that "there is only one way out."

As a result of the threats, Bollinger was "mortified" that Malmsberry would kill her son, or "beat him to a pulp." Docket No. 75 at 7, 17. She believed that Malmsberry had been in and out of prison since he was 17 for drug trafficking, guns, and assault. Bollinger believed that her friend, Cindy Brown, was "absolutely mortified of Shawn." Docket No. 75 at 16, 37. Bollinger reported the calls to the Sheriff's Office two or three times. Docket No. 75 at 9—10, 30—34; DX 3—4. A judge in Osceola County later issued a restraining

---

**10.** Malmsberry testified that he called Susan Bollinger only to discuss horses, to arrange for Cole Malmsberry to play with Bollinger's son, and because he was angry that Jason Bollinger had threatened Malmsberry. Docket No. 75 at 122—25. Malmsberry did recall telling Bollinger [as recorded on DX 1]:

"you're just afraid your little son is gonna get his ass kicked." Docket No. 75 at 143; DX 1, 3. Also, in reference to Jason Bollinger, Malmsberry more than once told U.S. Probation Officer Lester that he wanted to "kick his ass." Docket No. 75 at 82—84.

order to protect Bollinger. Docket No. 75 at 13, 49.

Bollinger recalls Angelia Lanham calling her around midnight one night in February 2001. Lanham was crying, hysterical, and very scared. Docket No. 75 at 10. Bollinger recalled that the windows of her truck had been broken out in the preceding months. Bollinger stayed up all night, and called the police early the next morning.

Angelia Wynn Lanham is a 38 year old woman from Palm Bay, Florida. Docket No. 76 at 40. Lanham's husband works with Susan Bollinger's husband. At around 11:00 p.m. on the evening of February 3, 2001, Lanham met Shawn Malmsberry for the first time at the Crossroads Bar six miles from where she lives.[11] Docket No. 76 at 42, 43, 54. Malmsberry walked up to the bar and ordered her a beer. Malmsberry told her that he lived in Hollow Paw, and Lanham said that she knew someone who lived there. Malmsberry said "their names wouldn't happen to be Susan and Robbie and Jason?"

Malmsberry jumped off the bar stool and became very angry. Malmsberry told Lanham that Susan Bollinger's son Jason Bollinger had lived with Malmsberry's ex-wife, and that Malmsberry was looking for Jason and wanted to kill him. Docket No. 76 at 42–43. Malmsberry reached into his pocket, pulled out a big handful of money, and offered the money to Lanham if she would take him to Jason. Docket No. 76 at 43. He said that he had more money if it was not enough. Docket No. 76 at 65. She asked Malmsberry "you've got to be kidding, right? You want me to take you to where someone is so you can kill him?" Malmsberry told her no, he wanted to dismember Jason, to cut his organs out, and to make him unrecognizable to his mother. Docket No. 76 at 43.

Malmsberry said that he hated Susan Bollinger and her "evil spawn." He said that he was going to kill the whole family, and anybody who got in his way. He said that nothing would stop him, ever. He pulled up his pants leg to show her that he was serious and had a gun. Docket No. 76 at 44. Lanham realized that Malmsberry was serious, not joking around, and not drunk. Docket No. 76 at 43, 45.

Malmsberry told Lanham that he was going to kill the Bollinger family, and had already been on their property. He said that he had a lot of guns, including a "nine" and an AK–47. Docket No. 76 at 44. Malmsberry told Lanham that he had broken a window on the property, and had waited for them to come outside of their mobile home so that he could shoot the family. When Lanham told Malmsberry that they had children, a little boy, Malmsberry told her that it did not matter, and that he would shoot anyone who got in his way. Docket No. 76 at 44.

Lanham left the bar, and arrived home around midnight. She woke up her husband to tell him what Malmsberry had said in the bar. Lanham then called Susan Bollinger to warn her about what Malmsberry had said. The next morning, Lanham went to the Bollinger's house. Lanham was still very upset. Lanham gave a sworn statement to the police by telling Susan Bollinger's husband what to write. Docket No. 76 at 47–48; GX 7. The statement was dated February 4, 2001. Docket No. 76 at 54; GX 7. Lanham told the police that Malmsberry had a number of friends in a motorcycle gang who would "take care of Susan's family." Docket No. 76 at 50. Lanham also told the police that Malmsberry had said that he wanted to pull out Jason's teeth after he was dead, and wear them around his neck. GX 7.

---

**11.** Malmsberry testified that he was not there. Docket No. 75 at 127.

On February 6, 2001, the Osceola County Sheriff's Office advised the United States Probation Office that Malmsberry had been charged on two counts of Aggravated Stalking, and that a warrant had been issued for Malmsberry's arrest. According to the police report and charging document, Malmsberry had threatened to kill Jason Bollinger and Susan Bollinger. With regard to the statement to Angelia Lanham, Malmsberry admitted to U.S. Probation Officer Lester that he had made the statement to someone, but that he was just "blowing off steam," and did not mean it. Docket No. 75 at 83, 143.

In conclusion, Malmsberry committed Aggravated Stalking in violation of Fla. Stat. § 784.048(3) by stalking Susan Bollinger, and her son, Jason Bollinger. Malmsberry willfully, maliciously, and repeatedly harassed Susan Bollinger and her son, and made credible threats by telephone with the intent to place both Susan Bollinger and Jason Bollinger in reasonable fear of death or bodily injury. Malmsberry's conduct constituted harassment because he engaged in a course of telephone calls directed at Jason Bollinger and Susan Bollinger that caused and would tend to cause substantial emotional distress in such person, and serves no legitimate purpose. Malmsberry's threats were "credible threats." He made his telephone threats with the intent to cause both Susan Bollinger and Jason Bollinger to reasonably fear for their safety. The threats were against the life of Susan Bollinger and Jason Bollinger, and were threats to cause bodily injury to Jason Bollinger and his family.

## IV. CONCLUSION

 For the foregoing reasons, this Court finds that the government has shown by a preponderance of the evidence that Malmsberry violated the conditions of his supervised release. Specifically, Malmsberry 1.) violated the general condition that he not commit another state crime by the Aggravated Stalking of Susan and Jason Bollinger in violation of Fla. Stat. § 784.048(3) on or about February 4, 2001; 2.) violated the general condition that he not commit another state crime by committing Battery on Cindy Brown in violation of Fla. Stat. § 784.03 on or about December 15, 2000; 3.) violated Condition 11 of the Standard Conditions by not reporting to his probation officer within 72 hours that he was questioned by Palm Bay Police Officer Chris Van Zandt on December 15, 2000 about battering Cindy Brown at home; 4.) violated Condition 11 of the Standard Conditions by not reporting to his probation officer within 72 hours that he was questioned by Palm Bay Police Officer Steve White on October 24, 2000 about a fight with Cindy Brown at her place of employment. It is respectfully RECOMMENDED that the United States District Court issue an order to show cause why Malmsberry's supervised release should not be revoked.

Failure to file and serve written objections to the proposed findings and recommendations in this report, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02, within ten days of the date of its filing shall bar an aggrieved party from a de novo determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.